UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re:

      JOHN R.M WILSON,                      Chapter 13
                                            Case No.  1-18-42302

                            Debtor.
-------------------------------------------------------x


**MEMORANDUM DECISION ON APPLICATION FOR ATTORNEY'S FEES**


*Appearances:*

Karamvir Dahiya, Esq.                Marianne DeRosa, Esq.
Dahiya Law Offices, LLC           100 Jericho Quadrangle (Suite 127)
75 Maiden Lane (Suite 506)        Jericho, NY 11753
New York, NY 10038                *Standing Chapter 13 Trustee*
  *Attorneys for the Debtor*


January 3, 2022

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Before the Court is the application for a final allowance of professional compensation of

Karamvir Dahiya, Esq. and Dahiya Law Offices, LLC ("DLO") for legal services provided to

John R.M. Wilson, the debtor in this Chapter 13 bankruptcy case, in connection with this

bankruptcy case and an associated adversary proceeding (the "Fee Application" or "Fee App.").

ECF No. 69.  For these services, DLO seeks professional fees of $65,480, reduced from the

original amount requested in the filing of $95,480, incurred over a period of almost three years,

from the petition date of April 25, 2018, to March 7, 2021, the date of the Fee Application.

Statement in Support of the Fee Application (the "Statement in Support" or "Stmt."), ECF No.

76, at 3.

The record of Mr. Wilson's Chapter 13 bankruptcy case, his adversary proceeding against

Oumrow Roy Singh, Sabrina B. Singh, and ASCB Management, Inc., and this Fee Application is

surprisingly complex.  Some of this complexity arises from the circumstances that Mr. Wilson

and his sister, Deslyn Johnson, were required to confront in order to undo the assertedly

fraudulent transfer of Ms. Johnson's home.  Ms. Johnson purchased her home in 2005, and some

time thereafter, she transferred it to Mr. Wilson in order to pursue a refinancing and avoid

foreclosure.  And after that, Mr. Wilson and Ms. Johnson transferred the property to the

defendants in the adversary proceeding, in a further effort to avoid foreclosure.  As the record

reflects, Mr. Wilson argued – successfully – in his adversary proceeding that this transaction was

part of a scheme to defraud him and Ms. Johnson of that property, in the guise of "rescuing" the

property from an imminent foreclosure.  These facts are complicated, and some of the associated

complexity in these proceedings was, perhaps, unavoidable.  And those circumstances give rise

to a significant portion of the fees that are sought here.

But not all of the complexity presented by this record was inevitable, or even necessary, and much of it could have been avoided. Mr. Wilson's Chapter 13 case drew no less than four motions to dismiss by the Chapter 13 Trustee, and each was well-grounded in the record of the case at the time it was made. Remarkably, the Chapter 13 Trustee attempted at least sixteen times to hold a Section 341 meeting of creditors, without success. Basic documents that must be provided by a Chapter 13 debtor, such as a certificate of credit counseling, an affidavit stating that the debtor has paid all amounts required to be paid under a domestic support obligation or that the debtor has no domestic support obligations, an affidavit stating whether the debtor has filed all applicable federal, state, and local tax returns, and copies of documentation of payment of all mortgage installments and lease payments that have come due since the filing of the petition, were never provided. And a realistic Chapter 13 plan was never proposed. The Chapter 13 Trustee's fourth motion to dismiss was granted without opposition by Mr. Wilson, and this case remains on the Court's docket solely to permit the resolution of this Fee Application.

And finally, this Fee Application itself presented several significant issues for the Court's consideration – but here too, it also presented challenges that could have been avoided. Despite requests and directions from the Court to DLO to complete adequate service, the Fee Application was not properly served until after the Court formally directed DLO to do so by entering an Order to Show Cause Why the Fee Application Should Not Be Denied for Failure to Comply with the Applicable Procedural Requirements (the "Order to Show Cause" or "OSC"). ECF No. 80. Service is fundamental to notice, and notice is fundamental to due process.

The Fee Application was also initially not supported by time records with the kind of information and detail that is required by this Court's General Order 613 ("General Order 613")

and Local Bankruptcy Rule 2016-1(a), among other sources of authority.  These requirements serve many important purposes, and permit the Court, the United States Trustee, and other parties in interest to understand an application and to determine whether an application should be granted or opposed.  And they apply in every case.  Here too, this deficiency was addressed by DLO only after the Court entered the Order to Show Cause directing DLO to file amended billing records.

DLO argues that a substantial fee is warranted here, for several reasons.  DLO argues that this Chapter 13 case and a related adversary proceeding have their roots in a nearly decade-long effort by Ms. Johnson to save her home at 1656 Park Place in Brooklyn (the "Property").  Fee App. at 2.  First, Ms. Johnson attempted to secure a loan modification with Wells Fargo Bank, N.A. ("Wells Fargo"), but that did not succeed, and a foreclosure action in New York Supreme Court followed.  Fee App. at 2.  After a judgment of foreclosure was entered and an auction sale for the Property was set for April 26, 2018, Ms. Johnson and Mr. Wilson met with Mr. Singh and Ms. Singh, who are among the defendants in the adversary proceeding.  Id.  As DLO states, believing that it was necessary to save the home, Mr. Wilson and Ms. Johnson transferred title to the Property to Mr. Singh's corporation, ASCB Management Inc. ("ASCB"), also a defendant in the adversary proceeding, and received "not . . . a penny" for the transfer.  Fee App. at 3.  And the day before the sale, on April 25, 2018, DLO filed this Chapter 13 bankruptcy case for Mr. Wilson.

DLO characterizes the transaction among Mr. Wilson, Ms. Johnson, and ASCB as, in substance, the theft of the Property, in the "'bustling' foreclosure rescue scam business set up by the defendants."  Fee App. at 3.  As DLO explains, as a consequence of the adversary proceeding, Mr. Wilson was successful in regaining title to the Property – and specifically, on

September 9, 2020, or nearly two years and four months after the adversary proceeding was commenced, this Court entered judgment in favor of Mr. Wilson and he was "declared to be the owner of the real property located at 1656 Park Place, Brooklyn." *Wilson v. Singh* (*In re Wilson*), Adv. Pro. No. 18-01062, ECF No. 72.

In this Fee Application, DLO seeks an award of fees for work representing Mr. Wilson in the successful adversary proceeding and for related work associated with the reimposition of the full protection of the automatic stay in Mr. Wilson's bankruptcy case.  It states that "this Fee Application relates to the adversary proceeding and most of the time entries pertains to the same" and "[t]he fees demand is primarily related to the work done on the adversary proceeding."  Fee App. at 3, 6.  Specifically, DLO seeks $65,480 in additional fees, which incorporates a $30,000 reduction from the initial request based upon a payment of $19,500 already made, a voluntary reduction of $3,465 in response to questions raised by Ms. Johnson, a voluntary reduction of $2,045 in response to questions raised by the Chapter 13 Trustee, and a voluntary reduction of $5,000 proposed by DLO on the record of the June 7, 2021 hearing.

DLO argues that this fee is warranted because, in substance, when the firm was retained, Mr. Wilson and Ms. Johnson faced an emergency situation that required an urgent and expert response.  DLO argues that "[t]he professional services performed . . . were in the best interests of the Debtor and his estate" and that the requested compensation "is commensurate with the complexity, importance, compressed timeframe and nature of the issues and tasks involved."  Fee App. at 4.  DLO argues that it is a "disinterested person" as defined in Bankruptcy Code Section 327(a), and that even though this requirement does not apply in Chapter 13 cases, DLO urges that it confirms that the work performed was "professionally done . . . keeping in view the best interest of the estate and the debtor."  Fee App. at 5.

The Chapter 13 Trustee (the "Trustee") opposes the Fee Application on several grounds, as stated in the Chapter 13 Trustee's Opposition to the Fee Application (the "Opposition" or "Opp."). ECF No. 70. As a threshold matter, she points out that the record does not show that DLO served the Fee Application, as a certificate of service of the Fee Application was not filed.[1] And she notes that the service addresses in the notice of motion similarly reflect incomplete service, as they do not include any creditors, or the United States Trustee, or Ms. Johnson – and service on each would be required by Bankruptcy Rule 2002, this Court's General Order 613, and principles of equity. She also points out that an inadequate form of service – e-mail and nothing else – was used to serve the Chapter 13 Trustee. For these reasons alone, she argues, the Fee Application cannot be granted.

As to the supporting documentation, the Trustee argues that this too is inadequate, and that the Fee Application must be denied because the professionals' time records are not separated into project categories, as required by this Court's General Order 613 and Local Bankruptcy Rule 2016-1(a). Opp. ¶¶ 10-11.

The Trustee also argues that the Fee Application is at odds with the Rule 2016(b) Statement filed in this case, disclosing compensation paid or promised to the debtor's attorney, again as required by General Order 613. That Statement, she notes, provides that DLO "agreed to a fee of $5,000, and that no fee balance was outstanding." Opp. ¶ 14. At the same time, the Trustee acknowledges that adversary proceedings were among the "expressly excluded services." Opp. ¶ 14.

And the Trustee argues that the fees sought are excessive for the work performed,

---

[1] The record shows that on March 23, 2021, just two hours after the Trustee filed her objection, DLO filed an Affidavit of Service stating that on March 16, 2021, the Fee Application was served on Mr. Wilson at his home address via "prepaid FedEx service." Aff. Serv., ECF No. 71.

particularly in light of the fact that all of the work performed by the firm was billed by Mr.

Dahiya as a senior and experienced lawyer, at his hourly rate of $550 per hour, when some of the

services provided could have been undertaken by more junior lawyers or paraprofessionals.  She

points out that the retainer agreement between Ms. Johnson, Mr. Wilson, and DLO dated March

27, 2018 (the "Retainer Agreement") refers to rates for associates, clerks, and paraprofessionals,

but that this "appears to be misleading because [DLO] does not appear to have any staff."  Opp. ¶

18.

More generally, the Trustee objects to all fees requested by DLO, to the extent that they

are sought for the underlying Chapter 13 case, because it is clear from the record of the case that

Mr. Wilson and DLO elected to file a Chapter 13 bankruptcy case "for purposes of delay and

forum shopping, and never intended to prosecute this case to confirmation or to pay any

creditors."  Opp. ¶ 19.  She notes that in Mr. Wilson's Chapter 13 plan, he proposes modest plan

payments of just $100 per month for sixty months, and states that upon recovery of the deed to

the Property, he will "'either refinance or sell it or have a reverse mortgage, whatever is

appropriate.'"  Opp. ¶ 20 (quoting Chapter 13 Plan).  And she states that this "is a plan to make a

plan," not a Chapter 13 plan.  Opp. ¶ 20.

To the same effect, the Trustee notes that she has attempted no less than sixteen times to

conduct the required meeting of creditors under Bankruptcy Code Section 341 – and yet, Mr.

Wilson was never examined.  Opp. ¶ 21.  Other deficiencies in the case, "including the failure to

serve the Plan and the failure to file the tax and domestic support obligation affidavits," also

persisted to the end and remain unaddressed.  Opp. ¶ 22.

And finally, the Trustee argues that DLO has not complied with General Order 613's

requirement that a fee application must certify that the United States Trustee, the Trustee, and the

debtor, within 21 days after the end of a month, are provided with a statement of fees accrued during that month.  In this context, the Trustee observes that "[t]his case demonstrates one of the reasons why it is customary to charge a flat fee for a Chapter 13 case" because "[c]harging an hourly rate 'makes the range of possible fees in a Chapter 13 case too difficult for debtors to predict.'"  Opp. ¶ 24 (quoting *In re Moukazis*, 479 B.R. 247, 253 n.3 (Bankr. E.D.N.Y. 2012)).

The Trustee's concerns about insufficient service, inadequate supporting documentation, and inconsistencies between the Fee Application and the Retainer Agreement were well grounded in the record of the case.  On August 31, 2021, the Court entered the Order to Show Cause, directing DLO to serve the Fee Application on all parties entitled to notice, file an affidavit of service, file amended billing records, and file a supplemental statement addressing the discrepancy in payment amounts.  OSC at 6-7.

On September 14, 2021, DLO filed several documents in response to the Court's Order to Show Cause.  These include a Supplemental Statement in Support of the Application for Fees (the "Supplemental Statement" or "Suppl. Stmt."), ECF No. 84; an Amended Disclosure of Compensation of Attorney for Debtor (the "Amended Rule 2016(b) Statement" or "Am. R. 2016(b) Stmt."), ECF No. 86; an Amended Project-Based Time Records (the "Amended Time Records" or "Am. Time Recs."), ECF No. 87; and an Amended Affidavit of Service (the "Amended Affidavit of Service" or "Am. Aff. Serv."), ECF No. 88 (together, the "Amended Filings").  In doing so, DLO substantially addressed the deficiencies and complied with the Order to Show Cause.  Had this not occurred, it is likely that the Order to Show Cause would have been granted and the Fee Application would have been denied.

The issues presented by this Fee Application and the Trustee's objection call for the Court to consider both procedural and substantive requirements attendant to the compensation of

a debtor's attorney.  On the one hand, the success of Chapter 13 cases – and adversary proceedings that may be associated with them – often depends on the work done by skilled and persistent attorneys representing the debtor.  On the other hand, the requirements of notice and this Court's general orders and local bankruptcy rules apply in this bankruptcy case, and in every bankruptcy case.  Substantial compliance with those requirements should be viewed as a necessary threshold component to the consideration of a fee application on the merits.  In the Amended Filings, DLO met these threshold requirements of notice, disclosure, and other matters, and the Court now turns to the question of whether the fees sought in the application should be allowed.

Viewed in this light, this Fee Application calls for the Court to apply the standards of the Bankruptcy Code and the cases interpreting it to assess the Fee Application on its merits and in light of the Trustee's additional and thoughtful concerns.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (O), and 1334(b), and the Standing Order of Reference dated August 28, 1986, as amended by the Order dated December 5, 2012, of the United States District Court for the Eastern District of New York.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and venue is proper before this Court pursuant to 28 U.S.C. § 1409.

## Background

### The Filing of this Bankruptcy Case

On March 27, 2018, Ms. Johnson and Mr. Wilson retained DLO to represent them "in the above stated issues/matters/cases," described as "1656 Park Place Brooklyn NY 11233 and fraudulent transfer of deed etc."  Retainer Agreement, ECF No. 69-1.  According to the Retainer

Agreement, Ms. Johnson and Mr. Wilson agreed to pay an initial retainer of $15,000.  The Retainer Agreement also provides that if 'there is any sale of the Client's assets and if the Firm has the sale proceeds either in the regular business or escrow account then [DLO] will have a lien on such proceeds . . . [and] the unqualified consent of the Client to apply such proceeds" to any balance due.  Retainer Agreement at 1.  The Retainer Agreement does not make any specific reference to the filing of a bankruptcy case or adversary proceeding.

About one month later, on April 25, 2018 – on the eve of a scheduled foreclosure sale – DLO filed a Chapter 13 bankruptcy case for Mr. Wilson.  And just over a week later, on May 4, 2018, DLO filed amended Schedules A/B, C, D, E/F, G, H, I, and J.  ECF No. 7.  On July 3, 2018, DLO filed Mr. Wilson's Chapter 13 plan.  That plan was amended from time to time as the case progressed, and DLO filed amended Chapter 13 plans on September 4, 2018, November 26, 2018, and March 25, 2019.

### Mr. Wilson's Motion To Reimpose the Automatic Stay

This Chapter 13 case is not Mr. Wilson's first bankruptcy filing, and his prior filing has consequences for the protection of the automatic stay here.  On May 25, 2017, Mr. Wilson, represented by DLO, filed his first Chapter 13 bankruptcy case.  That case had a variety of deficiencies, including failures to provide tax returns to the Chapter 13 Trustee and to comply with other disclosure requirements.  In addition, in that case, Mr. Wilson did not sign his bankruptcy petition and did not attend a Section 341 meeting of creditors.  As a consequence, the Trustee filed a motion to dismiss on July 24, 2017, and after a hearing on November 20, 2017, at which the Trustee appeared and was heard, and neither DLO nor Mr. Wilson appeared, the case was dismissed by order entered on December 18, 2017.  *See In re John R.M Wilson*, Case No. 17-42649.

On April 25, 2018, the same day as the filing of this second case, Mr. Wilson, by his attorney DLO, filed an emergency motion to reimpose the full protection of the automatic stay for the duration of Mr. Wilson's case under Bankruptcy Code Section 362(c)(3).  A few days later, on May 1, 2018, DLO filed an amended motion to reimpose the automatic stay (the "Amended Motion to Reimpose Stay").  On May 9, 2018, Wells Fargo filed opposition to the Amended Motion to Reimpose Stay.  On May 16, 2018, the Court held a hearing on the Amended Motion to Reimpose Stay, at which Mr. Wilson, by his attorney DLO, and Wells Fargo appeared and were heard.  And on May 16, 2018, the Court issued an order granting the Amended Motion to Reimpose Stay, providing for the full protection of the automatic stay to continue as to all creditors on and after May 25, 2018, the thirtieth day after the commencement of this case.

*Mr. Wilson's Participation in Loss Mitigation*

On July 8, 2018, about three months after this bankruptcy case was filed, and again on September 27, 2018, some two months later, Mr. Wilson, by his attorney DLO, filed a request to enter into this Court's loss mitigation program with respect to the Property.  And on October 16, 2018, the Court entered an order directing Mr. Wilson and the secured creditor, Wells Fargo, to participate in loss mitigation.

On the same day, October 16, 2018, Wells Fargo filed an objection to the loss mitigation request, stating, among other things, that Mr. Wilson did not serve the loss mitigation request upon the creditor, and more fundamentally, that Mr. Wilson was not eligible for this Court's loss mitigation program because he did not hold an ownership interest in the Property.  As Wells Fargo stated, "[p]rior to the instant filing, Debtor conveyed title to the concerned Property to ASCB Management Inc. by Bargain and Sale Deed . . . dated February 21, 2018."  Obj. to Loss

Mit. Request, ECF No. 35, at ¶ 6.

Over the next few months, the Court held periodic loss mitigation status conferences, at which DLO, on behalf of Mr. Wilson, and Wells Fargo appeared and were heard, and the status of the ownership of the Property was addressed. And on March 1, 2019, the Court entered an order terminating loss mitigation.

*The Trustee's First Motion To Dismiss*

On June 21, 2018, the Trustee filed a motion to dismiss this case (the "First Motion to Dismiss") on grounds, among others, that Mr. Wilson had not filed a Chapter 13 Plan as required by Bankruptcy Code Section 1321, and also had not provided the Trustee with disclosure documentation as required by Local Bankruptcy Rule 2003-1 or a copy of his federal income tax return as required by Bankruptcy Code Section 521(e)(2)(A)(i). Thereafter, Mr. Wilson addressed some of the deficiencies, including by filing a Chapter 13 plan on July 3, 2018. The Court held a hearing on the First Motion to Dismiss on July 9, 2018, at which the Trustee and Mr. Wilson, by his counsel DLO, appeared and were heard, and the Trustee withdrew the motion in anticipation of filing a renewed and updated Motion to Dismiss.

*The Trustee's Second Motion To Dismiss*

On July 26, 2018, the Trustee again filed a motion to dismiss this case (the "Second Motion to Dismiss") on grounds, among others, that Mr. Wilson's proposed plan payment was insufficient to pay his secured claims in full as required by Bankruptcy Code Section 1325(a)(5), and that he had he had not provided the Trustee with certain required documents.

The Court held hearings on the Second Motion to Dismiss from time to time and on February 25, 2019, at which the Trustee and Mr. Wilson, by his counsel DLO, appeared and were heard. And on March 7, 2019, the Trustee filed a letter withdrawing the Second Motion to

Dismiss in anticipation of filing a renewed Motion to Dismiss with additional grounds for dismissal.  ECF No. 47.

*The Trustee's Third Motion To Dismiss*

On March 7, 2019, the Trustee filed a third motion to dismiss this case (the "Third Motion to Dismiss") on grounds, among others, that Mr. Wilson's proposed plan contained "many inconsistencies and contradictions, making it difficult for any party receiving notice of the Plan to understand its provisions."  Third Mot. to Dismiss ¶ 4.  And the Trustee again stated that the proposed plan payment was insufficient to pay Mr. Wilson's secured claims in full as required by Section 1325(a)(5), and that Mr. Wilson had not provided the Trustee with certain required documents.  From time to time and on August 5, 2019, the Court held hearings on the Third Motion to Dismiss.  And on June 29, 2020, the Trustee withdrew the Third Motion to Dismiss, yet again in anticipation of filing a renewed Motion to Dismiss stating further grounds that warranted the dismissal of Mr. Wilson's case.

*The Trustee's Fourth Motion To Dismiss*

On September 4, 2020, the Trustee filed a fourth motion to dismiss this case (the "Fourth Motion to Dismiss"), on grounds, among others, that Mr. Wilson failed to file a Certificate of Credit Counseling as required by Bankruptcy Code Section 521(b)(1), and that the deadline for such a filing was not extended by a court order, that to date, the Section 341 meeting of creditors had never been held, despite thirteen attempts by the Trustee to do so, and that Mr. Wilson's Chapter 13 plan did not adequately address his secured claims and was not sufficiently funded to pay his secured claims in full.  Additionally, the Trustee again stated that Mr. Wilson had not provided the Trustee with certain required documents.

From time to time and on June 7, 2021, the Court held hearings on the Fourth Motion to

12

Dismiss at which Mr. Wilson, by his counsel DLO, and the Trustee appeared and were heard.  At

the June 7, 2021 hearing, the Court granted the Fourth Motion to Dismiss, on consent of Mr.

Wilson, by his counsel DLO, and directed the Chapter 13 Trustee to settle a proposed order

dismissing the Chapter 13 case on sixty days' notice.

And finally, on June 21, 2021, DLO filed a limited objection to the entry of the proposed

order of dismissal, and requested that the case not be dismissed until after this Fee Application

was decided.  ECF No. 79.

### *Mr. Wilson's Action Against Mr. Singh, Ms. Singh, and ASCB*

On May 21, 2018, Mr. Wilson commenced an adversary proceeding (the "ASCB

Action") against Mr. Singh, Ms. Singh, and ASCB (the "Defendants"), alleging that Mr. Wilson

and Ms. Johnson were victims of a predatory foreclosure rescue that caused them to lose title to

their home, and stating several counts or claims for relief.  *Wilson*, Adv. Pro. No. 18-01062, ECF

No. 1 (the "ASCB Complaint" or "ASCB Compl.").  In that action, Mr. Wilson and Ms. Johnson

asked the Court to declare the February 2018 deed transfer to be a mortgage pursuant to New

York Real Property Law Section 320, to void the deed that transferred title to the Property from

Mr. Wilson to ASCB and to terminate any security interest in the Property created by that

transaction, and to quiet title to the Property, among other relief.  *See* ASCB Compl. ¶ 65.

The Court held an initial pre-trial conference in the ASCB Action on July 17, 2018, at

which Mr. Wilson, by his counsel DLO, appeared and was heard, and the Defendants did not

appear.  From time to time thereafter, the Court scheduled continued pre-trial conferences, and

on February 27, 2019, Mr. Wilson filed a motion for judgment on the pleadings.  On June 19,

2019, Mr. Wilson filed an amended motion for judgment on the pleadings (the "Amended

Motion for Judgment on the Pleadings").  And on January 29, 2020, the Court issued a

scheduling order setting a date of March 11, 2020, for a continued pre-trial conference and hearing, including oral argument, on that motion.

At the March 11, 2020 hearing, the Defendants again did not appear, and on April 1, 2020, the Court issued an order scheduling a continued hearing and order to show cause why judgment against the Defendants should not be entered on the Ninth Cause of Action, for unjust enrichment, for May 19, 2020. Once again, on May 19, 2020, the Defendants did not appear. And again, on June 9, 2020, the Court held a hearing on the order to show cause, and the Defendants did not appear. The Court granted the motion in part, awarding judgment to Mr. Wilson on the unjust enrichment count, and directed Mr. Wilson to settle a proposed order and judgment directing the transfer of title on thirty days' notice.

On July 13, 2020, Mr. Wilson filed a notice of settlement of a proposed order and judgment, to be presented to the Court on August 17, 2020. On September 10, 2020, the Court entered an order and judgment granting in part the Amended Motion for Judgment on the Pleadings, and directing entry of judgment in favor of Mr. Wilson with respect to the Ninth Cause of Action seeking recovery of the Property on grounds of unjust enrichment. Order and Judgment dated Sept. 9, 2020, ECF Nos. 71, 72. In that Order and Judgment, Mr. Wilson was declared to be the owner of the Property, any registration of deeds or encumbrances contrary to that was nullified, the transfer of the deed from Mr. Wilson to ASCB was declared null and void, and the ownership of the Property was restored to Mr. Wilson. And on October 6, 2020, the ASCB Action was closed.

### *Mr. Wilson's Action Against Wells Fargo*

On August 7, 2018, Mr. Wilson commenced an adversary proceeding against Wells Fargo (the "Wells Fargo Action"), stating several counts or claims for relief including a

declaration that Wells Fargo violated the Real Estate Settlement Procedures Act, among other relief. *See Wilson v. Wells Fargo Bank, N.A.*, Adv. Pro. No. 18-01089, ECF No. 1.

The initial pre-trial conference in the Wells Fargo Action was adjourned from time to time at the request of the parties until January 15, 2019, and on that date, the Court held a pre-trial conference at which Mr. Wilson, by his counsel DLO, and Wells Fargo appeared and were heard.

Several months later, on September 20, 2019, the parties filed a notice of a stipulation of settlement between Mr. Wilson and Wells Fargo resolving the adversary proceeding. In the settlement, Wells Fargo agreed to pay $6,750 to resolve the Wells Fargo Action, comprised of a payment of $1,750 to Mr. Wilson and a payment of $5,000 as a legal fee to DLO. On October 1, 2019, the Court approved the agreement, including the legal fee term, and "so-ordered" that stipulation. And on January 14, 2020, the Court entered a second stipulation and order dismissing the Wells Fargo Action with prejudice, and the Wells Fargo Action was closed.

*This Application for Final Allowance of Professional Compensation*

On March 7, 2021, DLO filed this application for final allowance of professional compensation for the period from April 25, 2018 to March 7, 2021. On March 23, 2021, the Trustee filed Opposition to the Fee Application. On May 3, 2021, the Court held an initial hearing on the Fee Application, at which DLO and the Trustee appeared and were heard, and DLO was directed to provide annotated time records to the Trustee. Despite that direction, DLO did not promptly supplement the time records.

On June 4, 2021, DLO filed a reply in further support of the Fee Application, and on June 7, 2021, the Court held a continued hearing on the Fee Application, at which DLO, Ms. Johnson, and the Trustee appeared and were heard. At that hearing, DLO was permitted to supplement the

record with any further submissions by June 14, 2021, and subject to that direction, the Court

conditionally closed the record and reserved decision.  And on June 15, 2021, DLO filed an

additional statement in support of the Fee Application.  ECF No. 76.

On August 31, 2021, in the interests of clarifying and completing the record and

permitting a determination of the Fee Application on the merits, the Court reopened the record

and entered the Order to Show Cause, directing DLO to serve the Fee Application on all parties

entitled to notice, file an affidavit of service, file amended billing records, and file a

supplemental statement addressing the discrepancy in payment amounts by September 13, 2021.

OSC at 6-7.  In the Order to Show Cause, the Court also directed DLO to appear at a hearing on

September 21, 2021 and show cause why the Fee Application should not be denied.

Following a one-day extension of the deadline to respond, on September 14, 2021, DLO

filed the Amended Filings, including the Supplemental Statement, the Amended Rule 2016(b)

Statement, the Amended Time Records, and the Amended Affidavit of Service.  On September

21, 2021, the Court held a hearing, at which DLO, Ms. Johnson, the Chapter 13 Trustee, and the

U.S. Trustee appeared and were heard.  At that hearing, the Court denied and marked off the

Order to Show Cause, on grounds that DLO had substantially and in good faith complied with

the applicable procedural requirements identified in the Order.  And the Court again closed the

record and reserved decision.

_DLO's Arguments in Support of the Fee Application_

DLO advances several arguments in support of the Fee Application.  At the outset, it

notes that the Second Circuit has observed that "'[t]his Circuit's opinion is that the district court

has "a responsibility to protect its own officers in such matters as fee disputes."'"  Fee App. at 1

(quoting _Itar-Tass Russian News Agency v. Russian Kurier, Inc._, 140 F.3d 442, 444 (2d Cir.

1998) (internal citation omitted)).  DLO describes the steps taken on behalf of Ms. Johnson to save her home from foreclosure, including pursuing a refinancing in Mr. Wilson's name, seeking a mortgage modification, and finally, transferring the Property to Mr. Singh's corporation in order to "clean the debt by having the bank give more time to pay back."  Fee App. at 2.

But unfortunately, DLO explains, the mortgage rescue proved to be a "'bustling' foreclosure rescue scam business set up by" Mr. Singh and the Defendants in the ASCB Action. Fee App. at 3.  In order to undo the transfer of the Property, DLO states, "a lawsuit had to be commenced," and that led to the voiding of the transfer to ASCB and the recovery of the Property by Mr. Wilson.  As DLO states, "[t]his Fee Application relates to the adversary proceeding and most of the time entries pertain[] to the same," and that the "fees demand is primarily related to the work done on the adversary proceeding."  Fee App. at 3, 6.

DLO argues that that the services performed were necessary and in the best interests of Mr. Wilson and his estate, and that "this case was about bringing the property back . . . to the estate."  Fee App. at 4.  It also asserts that the requested compensation is "commensurate with the complexity, importance, compressed timeframe and nature of the issues and tasks involved" and that any delays were "caused by the non-responsive defendants" in the ASCB Action.  Fee App. at 4.

DLO also notes that the firm meets the definition of "disinterested person" set forth in Bankruptcy Code Section 101(14), as required by Section 327(a), even though Section 327 does not apply in the context of Chapter 13.  Fee App. at 5.  This confirms, DLO asserts, that "the services rendered were professionally done so keeping in view the best interest of the estate and the debtor."  *Id*.

As to the hourly rates charged, DLO states that the hourly rate of $550 charged for

attorney time is "set at a level designed to compensate DLO fairly for the work of its attorney and paraprofessionals and to cover fixed and routine expenses." *Id*. DLO notes that this $550 hourly rate reflects a reduction from $600 per hour at the request of Mr. Wilson, and that the rates charged here "are less than what other firms are charging for similar cases – even their so called 'blended rates' are higher than the charges used here." Fee App. at 6. DLO states that the "total service charges" are $95,480, and that reimbursement of expenses is waived. Fee App. at 6.

DLO states that the standard in the Second Circuit for fee applications is the "'presumptively reasonable fee standard.'" Fee App. at 7 (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 189 (2d Cir. 2008)). In making this determination, DLO urges the Court to consider the "relevant factors for an 'appropriate adjustment' of the lodestar" which:

> "include, but are not limited to, the attorney's customary hourly rate, the complexity and difficulty of the case, the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side), the experience, reputation and ability of the attorneys, and the preclusion of employment by the attorney due to acceptance of the case."

Fee App. at 7 (quoting *Brady v. Wal-Mart Stores, Inc.*, 2010 WL 4392566, at *3 (E.D.N.Y. Oct. 29, 2010)). DLO also cites to a fee dispute decision in a Fair Debt Collection Practices Act case – not a bankruptcy case – where the court observed that "'counsel is not required to record in great detail how each minute of [his] time was expended . . . But at least counsel should identify the general subject matter of his time expenditures.'" Fee App. at 8 (quoting *Silver v. Law Offices Howard Lee Schiff, P.C.*, 2010 WL 5140851 (D. Conn. Dec. 16, 2010) (alterations in original)).

DLO asserts that its rate of $550 is reasonable. It notes that "the reasonableness of the

rate sought is measured by the prevailing market rate for lawyers in the district in which the ruling court sits." Fee App. at 8 (citing *Polk v. New York State Dep't of Corr. Servs.*, 722 F.2d 23, 25 (2d Cir. 1983)). And it observes that while the firm was retained by Mr. Wilson in 2018, DLO's current attorney billing rate is $700, and that "'current rates, rather than historical rates, should be applied in order to compensate for the delay in payment.'" Fee App. at 8 (quoting *LeBlanc v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998)).

As to the qualifications of counsel, DLO states that Mr. Dahiya is "a Harvard Law graduate, with intense academic record" and "has twenty years of experience in complex litigation and bankruptcy law in several jurisdictions in the United States and abroad." Fee App. at 9. It also notes that the rate "is less than those charged by the peers with this level of experience, and even less than the assuaged blended rates of firms." Fee App. at 10. And DLO observes that it seeks compensation only for "the attorney's core time spent on core legal issues and execution thereof," and is not seeking compensation for extensive time spent conferring with Mr. Wilson and Ms. Johnson, researching issues in the case, and other collateral matters. *Id. See* Fee App. at 3, 6. Similarly, DLO states that it is not seeking compensation for work performed in the Chapter 13 bankruptcy case "barring the motion to re-impose stay." Fee App. at 10.

As to whether the time spent was reasonable, DLO states that it seeks compensation for a total of 214 hours spent "by one attorney [Mr. Dahiya] on the case for the Fees Period." *Id.* It argues, in substance, that both the firm's detailed and contemporaneous time records and the extensive filings made in the bankruptcy case and adversary proceeding support the conclusion that the amount of time spent was reasonable.

In particular, DLO argues that the time for which compensation is sought "is a product of the scrupulously kept contemporaneous, separate, time-records electronically as well as those

compositely put in time records from the marginalia and annotations of different tasks handled over the period of fees." Fee App. at 11. In situations "'where the record is substantial,'" DLO argues that "'it is permissible to file an application in the form of an affidavit, appending in computer printout form a copy of the relevant portions of the contemporaneous time records.'" Fee App. at 11 (quoting *Gucci Am., Inc. v. Rebecca Gold Enters., Inc.*, 1993 WL 88270, at *3 (S.D.N.Y. Mar. 23, 1993)).

And it states that the Court may "take judicial notice of the filings in this case . . . [because] '[t]hese records describe with adequate particularity the tasks performed.'" Fee App. at 11 (quoting *Internet L. Libr., Inc. v. Southridge Cap. Mgmt. LLC*, 2010 WL 3290965, at *3 (S.D.N.Y. Aug. 11, 2010)).

DLO argues that the amount of time for which compensation is sought should be viewed as reasonable in light of the complexity and difficulty of the case. It also states that the adversary proceeding to recover the Property for the benefit of Mr. Wilson and his bankruptcy estate is consistent with the services that "'a reasonable lawyer . . . would have performed in the same circumstances.'" Fee App. at 11 (quoting *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996)). And DLO points to Congress's intent in enacting Bankruptcy Code Section 330, arguing:

> Congress enacted section 330 of the Bankruptcy Code to liberalize the practice of granting the allowance of compensation to professionals in bankruptcy cases in order to ensure that "attorneys be reasonably compensated and that future attorneys not be deterred from taking bankruptcy cases due to a failure to pay adequate compensation."

Fee App. at 12 (quoting *In re UNR Indus., Inc.*, 986 F.2d 207, 208-09 (7th Cir. 1993)). In concluding, DLO adds that no prior application for compensation has been made, and that at present, DLO does not seek compensation for its time to prepare this Fee Application. Fee App.

at 12-13.

<u>*The Trustee's Arguments in Opposition to the Fee Application*</u>

The Trustee opposes the Fee Application, substantially to the extent that DLO seeks fees

in connection with Mr. Wilson's Chapter 13 bankruptcy case, on several grounds.  As a threshold

matter, she notes that DLO's Retainer Agreement is inconsistent with the firm's Disclosure of

Compensation filed with Mr. Wilson's bankruptcy petition.  ECF No. 7 at 29 (the "Rule 2016(b)

Statement").  Specifically, the Retainer Agreement states, in substance, that DLO will commence

work upon receiving an initial fee of $15,000, while the Disclosure of Compensation states that a

fee of $5,000 has been agreed to and paid.  Opp. ¶ 3.  To the same effect, the Trustee observes

that it is not clear whether the $15,000 fee described in the Retainer Agreement is inclusive of or

in addition to the $5,000 fee identified in the Rule 2016(b) Statement, or whether the fees now

sought include any of the sums already paid to the firm.  *Id.*

The Trustee also notes that, "upon information and belief, [DLO] has also received an

additional $5,000 under the terms of the settlement stipulation of a second adversary proceeding

against Wells Fargo Bank, N.A. for alleged RESPA violations."  Opp. ¶ 4.  And she observes

that she "is holding a total of $8,235.93 on behalf of the Debtor's estate, a fraction of the amount

sought by [DLO]."  Opp. ¶ 6.

In addition, the Trustee opposes the fees sought on grounds that they are "unreasonable

on their face."  Opp. ¶ 5.  She states that they are "largely related to an adversary proceeding in

which [Mr. Wilson] sought to unwind a transaction in which [he] alleged he was defrauded of his

home," and that "[t]he adversary proceeding was resolved by accelerated judgment without

substantive opposition from the defendants."  *Id.*

The Trustee also points out several significant procedural defects in the Fee Application.

She argues that DLO did not file a certificate of service of the Motion – and just hours after the Trustee filed her Opposition, DLO filed an Affidavit of Service.  Opp. ¶ 8.  She also notes that the addresses listed on the notice of the Fee Application are incomplete and deficient, so that even if service was made as indicated on the notice, it would remain defective.  Opp. ¶ 9.  The Trustee observes that the method of service upon Mr. Wilson is not indicated, that e-mail service on her office is inadequate, and that creditors, the United States Trustee, and Ms. Johnson do not appear to have been served, all in violation of Bankruptcy Rule 2002 and General Order 613, among other authorities and rules.  *Id*.  These defects in service were substantially cured by the service described in the Amended Affidavit of Service.

The Trustee also states that DLO does not separate its billing records into project categories, as required by General Order 613.  Without this information, she urges, "it is not feasible to meaningfully review the time records," and she objects to the Fee Application in its entirety "unless the time records are correctly prepared."  Opp. ¶¶ 10, 11.  These omissions were substantially cured by DLO's Amended Time Records, filed after the Court entered the Order to Show Cause.

In addition, the Trustee argues that there are significant and unexplained inconsistencies between the Rule 2016(b) Statement and the Retainer Agreement.  The Rule 2016(b) Statement cites a $5,000 fee paid before the case was filed, encompassing "'legal service for all aspects of the bankruptcy case.'"  Opp. ¶ 14 (quoting Rule 2016(b) Statement).  She acknowledges that it also notes that "judicial lien avoidances, relief from stay 'actions,' and adversary proceedings" are "expressly excluded."  Opp. ¶ 14.  The Rule 2016(b) Statement also notes that "an hourly agreement" with "a third party" was entered into, but the hourly rate is not identified.  Opp. ¶ 15. By contrast, the Retainer Agreement indicates a $15,000 initial retainer fee.  Opp. ¶¶ 13, 14.

The Trustee also argues that the $550 hourly rate sought by DLO for Mr. Dahiya's time is unreasonable.  She states that the standard hourly fee range for consumer bankruptcy work for solo and small firm practitioners in the Eastern District of New York is between $250 and $350 per hour.  Opp. ¶ 17.  She also notes that the Retainer Agreement identifies hourly rates of $150 to $200 for associates' time, and $75 to $125 for clerks' and paraprofessionals' time.  Opp. ¶ 18. And yet, she states, "[DLO] does not appear to have any staff."  *Id*.  Accordingly, the firm "has billed at the $550 hourly rate for services normally performed by junior associates and clerks, including research and service of papers."  *Id*.

Further, the Trustee opposes the Fee Application on grounds that, in substance, neither DLO nor Mr. Wilson ever seriously pursued a Chapter 13 case here.  Instead, she argues, DLO and Mr. Wilson filed this case "for purposes of delay and forum shopping, and never intended to prosecute this case to confirmation or to pay any creditors."  Opp. ¶ 19.  She notes that Mr. Wilson did not "meet the minimum responsibilities of a debtor in Chapter 13," as illustrated by the fact that he "has never been examined at a Meeting of Creditors, due to a variety of reasons including [DLO's] failure to timely file the Plan and [Mr. Dahiya] being out of town."  Opp. ¶¶ 19, 21.  And she describes Mr. Wilson's Chapter 13 Plan, dated March 25, 2019, as a "plan to make a plan," as the plan provides that, upon recovery of the deed, Mr. Wilson will "'either refinance or sell it or have a reverse mortgage, whatever is appropriate.'"  Opp. ¶ 20.  She also identifies other shortcomings, including Mr. Wilson's (and DLO's) failure to serve the Plan or to file tax and domestic support obligation affidavits, as required by Bankruptcy Code Sections 1325(a)(8) and 1325(a)(9) and this Court's Local Bankruptcy Rules.  Opp. ¶ 22.

Finally, the Trustee opposes the Fee Application on grounds that DLO did not comply with the requirement of General Order 613 to provide monthly statements of the fees and

disbursements that have accrued.  And she notes that this requirement, and the practice of

charging a flat fee for a Chapter 13 case, serve the useful purpose of providing information and

predictability for debtors and others in Chapter 13 cases, and to avoid situations such as this

"where fees have grown unchecked due to [DLO's] failure to comply with the requirements for

fee applications."  Opp. ¶ 23.  She concludes that, as the court noted in *In re Moukazis*, "'it is

doubtful that a prospective client will appreciate the likelihood that such routine services [in a

Chapter 13 case] could easily cause fees to balloon by thousands of dollars.'"  Opp. ¶ 24

(quoting *In re Moukazis*, 479 B.R. at 253 n.3).

*DLO's Reply*

On June 4, 2021, DLO filed a reply to the Trustee's opposition (the "Reply") in the form

of an affirmation in further support of the Fee Application.  ECF No. 73.  DLO characterizes the

Trustee's opposition as "frivolous" and "with no basis."  Reply at 1.  As to the question of

defective service, DLO argues that the Trustee received notice via the Court's ECF system, and

that "a vigilant attorney would have grasped the essence of the application."  *Id*.  It also notes

that adequate notice was effectively provided because the hearing on the Fee Application,

initially scheduled for March 30, 2021, was adjourned to May 3, 2021.  DLO also asserts that all

"impacted parties received an ECF notice" and that service was therefore complete.  Reply at 2.

DLO also disagrees that service on the United States Trustee is necessary.  It states that

the "U.S. Trustee didn't have to be served here, as there is a standing U.S. Trustee – service on

her is enough."  *Id*.  And DLO states that the requirement of service on the U.S. Trustee,

pursuant to General Order 613, is limited to Chapter 11 cases, and only the Chapter 13 Trustee is

required to be served here.  *Id*.

In addition, DLO replies that the requirement of General Order 613 that an attorney's

billings be separated into annotated project categories is, in fact, not a requirement at all, and that General Order 613 is "generally more applicable to attorneys in chapter 7 and 11 cases, but may be used by all professionals as appropriate." Reply at 2 (citing Gen. Order 613, Exh. A Project Categories). DLO also argues that "'[t]he Court has discretion to determine that the project billing format is not necessary in a particular case.'" Reply at 2 (quoting Gen. Order 613).

As to the inconsistency between the firm's Rule 2016(b) Statement and the Retainer Agreement, DLO again replies that the requirements of General Order 613 are primarily intended for Chapter 11 and Chapter 7 cases. And it asks, "[h]ow is this application inconsistent with [the] Rule 2016(b) [S]tatement?" Reply at 3. DLO also observes that the Trustee "forgets" that "this form, electronically present on our desktop . . . is inartful" and that it "does not accommodate the different variables." *Id*. It also states that "we should not be burdened if the form prescribed here is sloppily made." Reply at 4. As to the inconsistency between the Retainer Agreement and the Rule 2016(b) Statement as to the amount paid, DLO responds that, in substance, this reflects the back-and-forth between the firm, on the one hand, and Mr. Wilson and Ms. Johnson: "It is simple, $5000 was the only amount paid to commence the case (not $15,000). Retainer was the demand; Form 2016(b) is what happened." *Id*.

As to the key questions of whether the fees sought in the Fee Application are excessive for the work that was performed, and whether the hourly rate of $550 for Mr. Dahiya's time is reasonable, DLO replies that, despite the Chapter 13 Trustee's "enormous powers," the firm has "never seen our Trustee bring any plenary proceeding, commencing a robust litigation against predatory lenders . . . on behalf of [] debtors," and accordingly, debtors' attorneys must represent them in situations akin to that present here. Reply at 5.

DLO also replies that it is inappropriate to disparage a solo and small firm practitioner

based on that fact alone, and to compare a senior lawyer's hourly rate with that of a paralegal. *Id*. The firm states that it is being "disparaged as [a] solo and small firm practitioner," and that the Trustee's use of the rate of a paralegal, between $250 and $350 an hour is not reflective of Mr. Dahiya's expertise and skill as a senior lawyer. *Id*. DLO notes that "law firm size is no indicator of reasonableness [of hourly rates]," and that the Retainer Agreement was signed by both Mr. Wilson and Ms. Johnson and sets forth a discounted hourly rate of $550 that is a market rate, "reasonable considering counsel's qualifications, experience, and reputation." *Id*.

And DLO states that an attorney's billing rate – and his billing rate – is "'presumptively appropriate'" as an indication of "'the market rate.'" Reply at 6 (quoting *People Who Care v. Rockford Bd. of Educ., School Dist. No. 205*, 90 F.3d 1307, 1310 (7th Cir. 1996)). It also points to cases where comparable and higher rates were found to be reasonable, including cases that were decided as much as ten years ago. Reply at 6 (citing cases). And the firm argues that "evidence that one attorney charges a lower rate than another attorney does not make the higher rate 'unreasonable.'" Reply at 6 (quoting *Harris N.A. v. Acadia Invs. L.C.*, 2012 WL 1681985 (N.D. Ill. May 14, 2012)).

DLO also replies that the Trustee's objection is "based on [the] misguided belief that 'research' is 'normally performed by junior associates.'" Reply at 7. It states that this is "baseless conjecture," and notes that "senior lawyers" are "not barred from research," and may in fact, due to their experience and efficiency, be more cost-effective for their clients. Reply at 7 (citing *Harris*, 2012 WL 1681985, at *4). And in circumstances where senior lawyers perform research, DLO replies that the hourly rate need not be reduced "'simply because [the lawyer] performed legal research that could have been completed by a junior associate at a larger firm.'" Reply at 7 (quoting *Brown v. Starrett City Assocs.*, 2011 WL 5118438 (E.D.N.Y. Oct. 27,

2011)).  And DLO notes that it has not separately billed for items "routinely billed by law firms, such as Westlaw charges," and cites this as an "added justification for the rates."  Reply at 7.  It also observes that the Trustee does not identify what research could have been performed by a junior attorney, or provide "substantive reasoning or evidence to support her presumption."  Reply at 7-8.

DLO states that this case was undertaken "to pay the creditor" and that the Trustee does not support her "sweeping vague statement accusing" Mr. Wilson of filing this case "'for purposes of delay and forum shopping, and never intend[ing] . . . to pay any creditors.'"  Reply at 8 (quoting Opp. ¶ 19).  Rather, DLO argues, the purpose of the case was "to bring the property back to the estate and then sell the real property," and "[t]here are no creditors . . . other than [the] secured creditor."  Reply at 8.  As to the Trustee's arguments directed to Mr. Wilson's proposed Chapter 13 plan, DLO acknowledges that Section 1321 requires that the debtor file a plan, but notes that the unusual circumstances of the case required an unconventional approach.  *Id*.

DLO also replies that this Court's General Order 613 "pertains to Chapter 11 cases and not to Chapter 13," and therefore there is no requirement to periodically provide the United States Trustee, the Trustee, and Mr. Wilson with a statement of fees and disbursements accrued each month.  Reply at 9.  And DLO states that, "[o]n this record, the rates sought are reasonable," and that "it is clear" that DLO "would not have requested the fees" if the firm had not been successful in recovering the Property for the bankruptcy estate.  Reply at 10.

*The June 7, 2021 Hearing*

On June 7, 2021, the Court held a continued hearing on the Fee Application, at which DLO, Ms. Johnson, the Trustee, and the United States Trustee appeared and were heard.

27

At the hearing, DLO again confirmed that in the Fee Application, it does not seek fees for work performed in Mr. Wilson's Chapter 13 bankruptcy case, and that the Fee Application is "primarily based on the adversary proceeding," and again pointed to the duration and complexity of that action, as well as the successful result.  June 7, 2021 Hearing Tr. at 7:22.

The United States Trustee characterized DLO's assertion that service upon it was not necessary as "simply incorrect," and argued that "under Rule 2002(k), the U.S. Trustee is required to be served for all fee applications."  June 7, 2021 Hearing Tr. at 12:14-17.  The United States Trustee also noted that as of that date, "the U.S. Trustee was not served and was never served," and that it did not waive service.  June 7, 2021 Hearing Tr. at 12:18, 13:10.  The United States Trustee also stated that they joined in the Chapter 13 Trustee's opposition to the Fee Application.  June 7, 2021 Hearing Tr. at 13:16-18.  The Chapter 13 Trustee reiterated her opposition "as expressed in [her] papers."  June 7, 2021 Hearing Tr. at 12:6.

And finally, Ms. Johnson, on behalf of herself and the debtor Mr. Wilson, questioned several aspects of the Fee Application, and expressed concerns about the substantial amount of fees that was requested.  June 7, 2021 Hearing Tr. at 22:1-8.  And in response to these concerns, among other reasons, DLO voluntarily reduced the amount sought in the Fee Application by $10,500 on the record of the June 7 hearing.  *See* June 7, 2021 Hearing Tr. at 17.  DLO also clarified that it had already received $19,500. June 7, 2021 Hearing Tr. at 16:8-9.

In view of the issues that were raised, and in the interests of a complete record, the Court permitted DLO to supplement the record by June 14, 2021, and otherwise closed the record and reserved decision.

*DLO's Statement in Support of the Fee Application*

On June 15, 2021, DLO filed a further Statement in Support of the Fee Application (the

"Statement in Support" or "Stmt.").  In the Statement in Support, DLO argues that "the bankruptcy trustee lacks standing to object to the fees, as the fees are not going from the estate to be administered," and "no plan is being confirmed."  Stmt. at 1.  In particular, DLO argues, because the Chapter 13 Trustee does not have a pecuniary interest in the estate, she lacks standing to object to the fees requested.  Stmt. at 1 (citing *In re Jones*, 494 B.R. 569, 572 (Bankr. M.D. Fla. 2013)).

DLO also states that notice to the United States Trustee is "not required by statute," and "Section 2002(k) does not apply to Chapter 13 fee[] application[s]."  Stmt. at 1.  The firm points to the Ninth Circuit's observation that "'Chapter 13 debtors' attorneys are awarded fees under [Section] 330(a)(4)(B) rather than [Section] 330(a)(1)'" and "'[Section] 330(a)(4)(B) contains no explicit notice-and-hearing requirement.'"  Stmt. at 1-2 (quoting *In re Eliapo*, 468 F.3d 592, 602 (9th Cir. 2006)).  And DLO notes that immediate collection "is only possible of what the Chapter 13 [Trustee] is holding now" and "for the rest of the monies, [DLO] will have to obtain a judgment and a lien and then move for state-based enforcement of the judgment."  Stmt. at 2.

And DLO states that while Ms. Johnson had raised concerns with certain time entries, those issues have been resolved, a "credit has been given for the fees paid" and "additional fees have been waived."  Stmt. at 3.  In concluding, DLO confirmed that it seeks a fee award of an additional $65,480, reflecting a voluntary reduction of $10,500 and a partial payment by the client of $19,500 that DLO has already received.  Id.

*The Court's Order to Show Cause Why the Fee Application Should Not Be Denied for Failure To Comply with the Applicable Procedural Requirements*

On August 31, 2021, this Court entered an Order to Show Cause to address the persistent threshold procedural deficiencies of the Fee Application.  This Court stated that the record, as of the date of the OSC, showed that DLO had yet to cure service deficiencies, file amended time

records, or explain the inconsistencies between the Rule 2016(b) Statement and the Retainer

Agreement.  OSC at 5.  This Court also stated that it had identified and addressed the procedural

deficiencies of the Fee Application and directed DLO to provide annotated time records to the

Chapter 13 Trustee, and to supplement the record to address the procedural deficiencies, on the

record of the May 3, 2021 and June 7, 2021 hearings, and, yet, the deficiencies remained

unaddressed.  OSC at 4.

 In response to these outstanding procedural deficiencies, this Court ordered DLO to:

1. Serve, by first class mail, the Fee Application, on the Debtor, the Chapter 13 Trustee, the United States Trustee, and all other parties entitles to notice, as required by Bankruptcy Rule 2002;

2. File an affidavit of service stating that the Fee Application has been served, by mail, on the Debtor, the Chapter 13 Trustee, the United States Trustee, and all other parties entitled to notice, as required by Bankruptcy Rule 2002;

3. File amended billing records as an attachment to the Fee Application, separated into project categories, with each service showing a separate time entry, as required by General Order 613;

4. File a supplemental statement addressing the discrepancy in payment amount between the firm's Rule 2016(b) Statement and the Retainer Agreement;

OSC at 6-7.

 The Court also directed DLO to appear at a hearing on September 21, 2021 "to show

cause why the Fee Application should not be denied for failure to comply with the Bankruptcy

Rules, this Court's Local Bankruptcy Rules, and General Order 613."  OSC at 7.

### *DLO's September 14, 2021 Amended Filings and the September 21, 2021 Hearing*

 On September 14, 2021, following the entry of the Order to Show Cause, DLO filed the

Supplemental Statement, the Amended Rule 2016(b) Statement, the Amended Time Records,

and the Amended Affidavit of Service.

In the Amended Affidavit of Service, DLO indicates that the Fee Application with the "project based timesheet" was served upon the required parties via FedEx Delivery Services. Am. Aff. Serv.  Notably, the Office of the United States Trustee was served.  Am. Aff. Serv.

In the Amended Time Records, DLO reorganizes the time entries to comply with General Order 613's requirement that billing records be separated into project categories.  DLO incorporates headings to clarify the project categories.  Headings include, among others, "Correspondence with the Court," "Client Meeting/Intakes," "Motions," and "Court Hearings." Am. Time Records at 1-5.

In the Supplemental Statement and the Amended Rule 2016(b) Statement, DLO addresses certain of the inconsistencies among the Retainer Agreement, the Fee Application, and the original Rule 2016(b) Statement.  Specifically, the Amended Rule 2016(b) Statement states that Ms. Johnson made a $5,000 pre-petition payment to DLO and that DLO has received $19,500 in fees, including that pre-petition payment.[2]  *See* Am. R. 2016(b) Stmt.  DLO also states that the balance of the fees requested in the Fee Application are based upon the number of hours worked, at the $550 hourly rate set forth in the Retainer Agreement.  *Id*.

At the September 21, 2021 hearing, DLO, Ms. Johnson, the Chapter 13 Trustee, and the U.S. Trustee appeared and were heard, this Court found that DLO had demonstrated substantial and good faith compliance with the Order to Show Cause, and the Order to Show Cause was denied and marked off the calendar.

### The Applicable Legal Standards

As this Court has recently observed in *In re Polanco*, 626 B.R. 12 (Bankr. E.D.N.Y.

---

[2]  DLO does not specify whether the $19,500 amount of previously paid legal fees includes the $5,000 legal fee paid by Wells Fargo and approved by the Court in the October 1, 2019 Order Resolving the Adversary Proceeding.  *See Wilson*, Adv. Pro. No. 18-01089, ECF No. 18.

2021), Bankruptcy Code Section 329 provides that any attorney representing a debtor in, or in connection with, a bankruptcy case, "shall file with the court a statement of the compensation paid or agreed to be paid." 11 U.S.C. § 329(a). The court, in turn, may award "reasonable compensation for actual, necessary services" rendered by an attorney and by any professional or paraprofessional employed by such attorney. 11 U.S.C. § 330(a)(1)(A). And where necessary, the court may direct the return of any compensation payment if it "exceeds the reasonable value of any such services." 11 U.S.C. § 329(b). *See In re Polanco*, 626 B.R. at 21-22.

In a Chapter 13 case, additional guidance is provided by Bankruptcy Code Section 330(a)(4)(B), as follows:

> In a . . . chapter 13 case . . . the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

11 U.S.C. § 330(a)(4)(B). *See In re Polanco*, 626 B.R. at 22.

Courts recognize that questions of attorney compensation in Chapter 13 cases are committed to the sound discretion of the bankruptcy court. As one court observed, "[t]he use of 'may allow' in [Section 330(a)(4)(B)] makes clear that whether fees are reasonable is a matter of the court's discretion." *In re Moukazis*, 479 B.R. at 248. *See Polanco*, 626 B.R. at 22.

Those "other factors," as set forth in Section 330(a)(3), are:

(A)     the time spent on such services;

(B)     the rates charged for such services;

(C)     whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D)     whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E)     with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).  *See In re Polanco*, 626 B.R. at 22.

The application of Section 330's factors is not a "matter of mechanically counting up the factors, to determine reasonableness by a majority tally.  The prevailing method for weighing § 330(a)(3) factors is the 'lodestar' approach."  *In re Hanover*, 2020 WL 2554229, at *3 (Bankr. E.D.N.Y. May 19, 2020).  As this Court has observed, "'[t]he lodestar amount represents the number of hours reasonably worked on a case multiplied by the reasonable hourly rate.'"  *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 766 (Bankr. E.D.N.Y. 2005) (quoting *Wells v. Bowen*, 855 F. 2d 37, 43 (2d Cir. 1988)).  *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (stating that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate").  *See also In re Polanco*, 626 B.R. at 22.

Notably, courts recognize these same factors in considering a wide range of fee applications by bankruptcy professionals that provide services in a wide range of bankruptcy cases, from a Chapter 7 trustee's retained counsel to the professionals retained by the debtor in a large Chapter 11 business reorganization.  And Section 330 does not include a list of specified tasks that are covered, nor could it, because the range of "actual, necessary services" varies from situation to situation, case to case, and chapter to chapter.  As one respected commentator notes, "[t]he statute makes no attempt, nor is it possible, to enumerate the spectrum of actual and necessary services that may be performed by a trustee or a professional person."  3 *Collier on*

*Bankruptcy* ¶ 330.03 at 330-27 (Richard Levin & Henry J. Sommer eds., 16th ed. 2021). *See In re Polanco*, 626 B.R. at 22-23.

Sections 330(a)(3)(A) and 330(a)(3)(D) – the Time Spent on the Services and Whether the Services Were Performed Within a Reasonable Amount of Time Commensurate with the Nature of the Task. Two of Section 330(a)(3)'s factors call for the Court to consider how much time was spent on the services, and whether that amount of time was reasonable "commensurate with the complexity, importance, and nature of the problem, issue, or task addressed." 11 U.S.C. § 330(a)(3)(D). Simply put, these considerations call for the Court to determine how much time was spent on the particular task for which the professional seeks compensation, and whether that amount of time for that task makes sense. *See In re Polanco*, 626 B.R. at 23.

The reasonableness of the hours expended is a "critical lodestar component." *In re Hanover*, 2020 WL 2554229, at *3. Courts must exclude hours that are "excessive, redundant, or otherwise unnecessary" and have "discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *In re Ridgemour Meyer Props., LLC*, 2018 WL 2305765, at *13 (Bankr. S.D.N.Y. May 18, 2018) (citing *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998)), *aff'd*, 599 B.R. 215 (S.D.N.Y. 2019), *aff'd*, 791 F. App'x 279 (2d Cir. 2020). *See In re Polanco*, 626 B.R. at 23.

While the lens of hindsight is tempting and perhaps inevitable, courts agree that "[i]n evaluating the award of professional fees, courts objectively consider whether the services rendered were reasonably likely to benefit the estate from the perspective of the time when such services were rendered." *In re Value City Holdings, Inc.*, 436 B.R. 300, 305 (Bankr. S.D.N.Y. 2010) (citing *In re Kohl*, 421 B.R. 115, 125 (Bankr. S.D.N.Y. 2009)). As this Court has observed, "this supports the salutary objective that attorneys should not be deterred from

undertaking the representation of debtors in bankruptcy cases, including cases that may pose significant challenges and an uncertain outcome, due to a risk of inadequate compensation." *In re Korea Chosun Daily Times, Inc.*, 337 B.R. at 767 (citing *In re Ames Dep't Stores, Inc.*, 76 F.3d at 72). *See In re Polanco*, 626 B.R. at 23.

And in this context, "'[b]ankruptcy courts enjoy wide discretion in determining reasonable fee awards.'" *In re Cenargo Int'l, PLC*, 294 B.R. 571, 596 (Bankr. S.D.N.Y. 2003) (quoting *In re Raytech Corp.*, 241 B.R. 785, 788 (D. Conn. 1999)). In exercising this discretion, the court may call upon its knowledge and experience in similar matters, and in the case at hand. As the Second Circuit noted, "the Bankruptcy Court did not abuse its discretion in approving as reasonable [the firm's] final fee application" because the judge "presided over th[e] bankruptcy for its duration and had the opportunity to evaluate first-hand both the quality of [the firm's] performance and the contributions made by the firm." *Bernheim v. Damon & Morey, LLP*, 2007 WL 1858292, at *2 (2d Cir. June 28, 2007). *See In re Polanco*, 626 B.R. at 23.

This discretion may call for careful attention to the record, including the billing records that support the professional's application. As the Second Circuit has also observed, it may be necessary to "carefully and independently review[] the attorney time and expense reports to ensure that they were reasonable and commensurate with the tasks undertaken." *In re Hoti Enters.*, 605 F. App'x 67, 68 (2d Cir. 2015). *See In re Polanco*, 626 B.R. at 23.

<u>Sections 330(a)(3)(B) and 330(a)(3)(F) – the Rates Charged for the Services and Whether the Compensation Is Reasonable Based on Customary Compensation in Non-Bankruptcy Matters.</u> Section 330's factors also call for the Court to consider the professional's rate, and to view it not only in the context of rates charged for bankruptcy matters but also in the context of "customary compensation charged by comparably skilled practitioners in cases other than cases

under [the Bankruptcy Code]." 11 U.S.C. § 330(a)(3)(F). And of course, the reasonableness of the professional's rate is also important in undertaking a lodestar review. *See In re Polanco*, 626 B.R. at 24.

As this and other courts have observed, the reasonableness of the hourly rate is determined by considering "that fee which is customarily charged in the local community by someone who possesses similar skill, experience, expertise, stature and reputation who is faced with similarly novel and complex issues and who procures comparable results." *In re Korea Chosun Daily Times, Inc.*, 337 B.R. at 767 (quotations and citations omitted).

Viewed another way, this calls for the Court to consider "prevailing market rates for attorneys with comparable skill and standing in the pertinent legal community." *In re Ridgemour Meyer Props., LLC*, 2018 WL 2305765, at *13 (citing *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000)). And as the Second Circuit has noted, the court's review may well also encompass an assessment of "the hourly rates of competitors in the marketplace." *In re Hoti Enters.*, 605 F. App'x at 68. *See In re Polanco*, 626 B.R. at 24.

Section 330(a)(3)(C) – Whether the Services Were Necessary and Beneficial to the Debtor or the Estate. Another key factor in the determination of a professional's fee is the benefit of the representation to the debtor or the estate. Here too, it is important to note that as with the question of the reasonableness of the time expended, courts do not determine necessity and benefit with the advantage of hindsight. As one bankruptcy court explained, "[a] decision reasonable at first may turn out wrong in the end. The test is an objective one, and considers 'what services a reasonable lawyer or legal firm would have performed in the same circumstances.'" *In re CCT Commc'ns, Inc.*, 2010 WL 3386947, at *5 (Bankr. S.D.N.Y. Aug. 24, 2010) (quoting *In re Ames Dep't Stores, Inc.*, 76 F.3d at 72). *See In re Brous*, 370 B.R. 563,

574 (Bankr. S.D.N.Y. 2007) (finding that "[a]lthough the outcome was disappointing, the services were nonetheless reasonable at the time that they were rendered.") *See also In re Polanco*, 626 B.R. at 24.

For these same reasons, the success or failure of the particular claim or position is not the sole determinant of whether the services in question were ultimately "necessary and beneficial" to the debtor or the debtor's estate. As one court put it, legal services that "are performed well, with due adherence to an attorney's duties and in the good faith litigation . . . are 'necessary' and 'beneficial' services for which compensation is owed, regardless of whether the client won or lost the underlying case." *In re Haimil Realty Corp.*, 579 B.R. 19, 27 (Bankr. S.D.N.Y. 2017) (citing *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am.* (*In re JLM*), 210 B.R. 19, 24, 27 (B.A.P. 2d Cir. 1997)). *See In re Polanco*, 626 B.R. at 24.

That is, this factor calls for the court to consider "'what services a reasonable lawyer or legal firm would have performed in the same circumstances.'" *In re Haimil Realty Corp.*, 579 B.R. at 27 (quoting *In re Keene Corp.*, 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997)). At the same time, "'[a]n attorney should only proceed with a legal service if the potential benefit of the service, which takes into consideration the chances of success, outweighs the cost.'" *In re Haimil Realty Corp.*, 579 B.R. at 27 (quoting *In re Angelika Films 57th Inc.*, 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998)). *See In re Polanco*, 626 B.R. at 24-25.

## Discussion

As this Court has recently observed, "it is the rare situation where a Chapter 13 debtor can achieve that 'fresh start' without the assistance of an attorney." *In re Polanco*, 626 B.R. at 33. And "[a]s other courts have noted, 'debtors' likelihood of success in the Chapter 13 arena is far greater if they are represented by counsel,' and 'attorneys should be justly compensated for

their services and not limited by a flat fee in complex or difficult cases.'" *In re Polanco*, 626

B.R. at 33 (quoting *In re Wesseldine*, 434 B.R. 31, 40 (Bankr. N.D.N.Y. 2010)).

To the same effect, and again as this Court has observed :

[I]n the related context of professional fee applications in Chapter 11
reorganizations, "attorneys should not be deterred from undertaking the
representation of debtors in bankruptcy cases, including cases that may pose
significant challenges and an uncertain outcome, due to a risk of inadequate
compensation."

*In re Polanco*, 626 B.R. at 33 (quoting *In re Korea Chosun Daily Times, Inc.*, 337 B.R. at 767

(citing *In re Ames Dep't Stores, Inc.*, 76 F.3d at 72)).

The risks and uncertainties inherent in representing a debtor in a Chapter 13 case, in

which the time horizon for success may be five years or more, may loom especially large.  As

this Court has noted, "[n]ot every Chapter 13 case succeeds, and not every measure of success is

the same.  But where the case does succeed, the funds are available, and the applicable standards

are met, it is appropriate and fitting that an award of compensation should be made." *In re*

*Polanco*, 626 B.R. at 33.

That is, this Court recognizes the significant value that attorneys bring to the efforts of

individual debtors in their attempts to address their financial circumstances through Chapter 13.

This is especially true where, as here, the additional step of an adversary proceeding is required

to recover a debtor's real property – and indeed, DLO states that it seeks an award of fees

primarily for that work.  But the process by which attorneys apply to the Court for compensation

is not unchecked.  And each and every attorney serving as bankruptcy counsel, in any chapter,

must meet the justifiably rigorous procedural hurdles that accompany applications for

compensation.

DLO's Fee Application calls for this Court to consider and apply the substantive criteria

that govern a request for compensation for a debtor's attorney in a bankruptcy case, including whether the time spent by the professional was reasonable and proportionate to the complexity of the task at hand; whether the rate charged for the professional's time is reasonable, including in light of what would be customary in both bankruptcy and non-bankruptcy matters; and whether the services provided were necessary or beneficial to the debtor when they were performed.

But before those matters are addressed, the Court must consider certain threshold matters – specifically, whether the procedural requirements of the process to request an award of fees have been met, including the requirements of notice and adequacy of information.

*The Threshold Questions of Notice and Adequacy of Information*

The Bankruptcy Code, Bankruptcy Rules, and this Court's Local Bankruptcy Rules establish several threshold requirements for a fee application. Each applies here, and in every bankruptcy case. And as the Local Rules make plain, "[f]ailure to comply with the Federal Rules of Bankruptcy Procedure, these rules or individual chambers rules of Judges may result in denial of the relief requested, dismissal, or other sanctions." EDNY LBR 1001-1(b)(4). Both this District's Local Rules, collected in General Order 613 for applications of this kind, and Bankruptcy Rules 2002(a) and 2016(a), set forth specific requirements for attorneys applying to the court for compensation in bankruptcy cases, in order to permit a necessary and meaningful review by interested parties, the United States Trustee, and the Court.

One of the most essential procedural requirements in a fee application is that it provide twenty-one days' notice to the debtor, the trustee, and all creditors, by mail. Without notice, there can be no meaningful review, and notice requires service on all necessary parties. And further, Bankruptcy Rule 2002(k) requires that the United States Trustee shall receive notice "on all applications for compensation or reimbursement of expenses." Fed. R. Bankr. P. 2002(k).

Here, DLO initially did not provide adequate notice to the Chapter 13 Trustee and all creditors, as required by Bankruptcy Rule 2002(a)(6). Pursuant to Bankruptcy Rule 2002(a)(6), an entity requesting compensation or reimbursement of expenses must provide twenty-one days' notice to "the debtor, the trustee, [and] all creditors." Fed. R. Bankr. P. 2002(a)(6). Similarly, General Order 613 requires that "the United States Trustee, trustee, and . . . the debtor [be] provided with a copy of the relevant fee application at least 21 days before the date set by the court or any applicable rules for filing fee applications." Gen. Order 613(B)(3). The original Certificate of Service filed by DLO shows service only upon Mr. Wilson. *See* Certificate Serv., ECF No. 71. DLO cured this defect, as set forth in the Amended Affidavit of Service, filed on September 14, 2021. *See also* Am. Aff. Serv, ECF No. 88.

It is also fundamental that fee applications include complete, accurate, and organized information so that interested parties and the Court can undertake an effective review of the application. Here, the Fee Application, as initially filed, did not include this kind of information, and these deficiencies were not addressed – despite several directions from the Court – until after the Court entered the Order to Show Cause.

First, DLO did not separate its billing records into project categories as required by this Court's General Order 613, which provides that "to facilitate effective review of the [fee] application, all time and service entries should be arranged by project categories." Gen. Order 613(A)(4)(i). General Order 613 provides sample project categories, including "Relief from Stay Proceedings," "Case Administration," and "Litigation." Gen. Order 613, Exh. A. As originally filed by DLO, the Fee Application did not identify any project categories. But following this Court's Order to Show Cause, DLO addressed this defect as reflected in the Amended Time Records, filed on September 14, 2021. Am. Time Recs., ECF No. 87.

Second, there were significant and unexplained discrepancies between the Rule 2016(b) Statement submitted with Mr. Wilson's bankruptcy petition and the Retainer Agreement submitted with the Fee Application.  Bankruptcy Rule 2016(b) requires a debtor's attorney to file a disclosure of compensation paid or promised to the attorney by the debtor – the Rule 2016(b) Statement – at the outset of the bankruptcy case.  Fed. R. Bankr. P. 2016(b).  And General Order 613 requires a Chapter 13 debtor's attorney making a fee application to state "whether the application is in accordance with the [Rule] 2016(b) statement that was filed at the beginning of the case."  Gen. Order 613(A)(2)(iii).

DLO's Rule 2016(b) Statement discloses a $5,000 fee paid before the case was filed and an hourly agreement with a third party at an unidentified rate.  By contrast, the Retainer Agreement indicates a $15,000 retainer fee and identifies three tiers of hourly rates:  an hourly rate for Mr. Dahiya of $550, a counsel hourly rate of $450¸ a junior attorney hourly rate from $250 to $350, and a clerk and paraprofessional hourly rate from $75 to $125.  Here too, following this Court's Order to Show Cause, DLO addressed and clarified this discrepancy in its Amended Rule 2016(b) Statement and Supplemental Statement, both filed on September 14, 2021.

As this Court has recently observed, noncompliance with General Order 613, as well as Bankruptcy Rule 2016, in an application for compensation, may well be "insurmountable obstacles to an award of fees."  *In re Polanco*, 626 B.R. at 26.  And here, it is worth noting that DLO's failure to serve the necessary parties and to provide adequate notice of the Fee Application, had it not been cured, would likely have led this Court to deny the Fee Application in its entirety.  Service and notice are foundational to due process and are required by the Local and Federal Rules in making such requests.  However, in light of the steps taken by DLO to

address these deficiencies, including the Amended Affidavit of Service and Amended Time Records, the Court turns to the merits of the Fee Application.

### Whether the Fee Application Should Be Granted

Bankruptcy Code Section 330(a)(3) and the many cases that have interpreted and applied it provide the template for considering an award of compensation for a debtor's attorney in a Chapter 13 case. And courts agree that in both Chapter 11 and Chapter 13 cases, these considerations often inform the calculation of a reasonable fee using the lodestar approach, representing "'the number of hours reasonably worked on a case multiplied by the reasonable hourly rate.'" *In re Korea Chosun Daily Times, Inc.*, 337 B.R. at 766 (quoting *Wells*, 855 F.2d at 43). *See In re Nicholas*, 496 B.R. 69, 74 (Bankr. E.D.N.Y. 2011) (stating that "[w]hen attorney's fees are awarded under the Court's inherent powers, courts use the lodestar approach").

This calls for the Court to consider three questions – first, whether the time spent by the professional was reasonable and proportionate to the complexity of the task at hand; second, whether the rate charged for the professional's time is reasonable, including in light of what would be customary in both bankruptcy and non-bankruptcy matters; and third, whether the services provided by the professional were necessary or beneficial to the debtor at the time that they were performed. The Court considers these questions in turn.

### Whether the Time Spent by DLO on Services to Mr. Wilson Was Reasonable and Proportionate to the Issues in the Case

The first question for the Court to address is whether the time spent by DLO and Mr. Dahiya, as reflected in the hours recorded, was reasonable and proportionate to the issues in the case. This, in turn, raises two preliminary questions: how to consider aggregated or "lumped" time entries, and whether DLO has exceeded the scope of its Fee Application by including time recorded for tasks undertaken in Mr. Wilson's bankruptcy case.

The use of "lumped" time entries.  One issue presented by the record is the use of "lumped" time entries by DLO in connection with the Fee Application.  DLO seeks compensation for services in the ASCB Action and the Motion to Reimpose the Automatic Stay. When assessing reasonableness, the Court looks at "the records that were maintained by the professional at the time the work was performed."  *In re Polanco*, 626 B.R. at 25.  Here, the Trustee correctly points out that pursuant to this Court's General Order 613, a fee application must be supported by time records separated by project categories, in order to permit a meaningful review by interested parties and the Court.  Bankruptcy Rule 2016 similarly requires that an attorney's fee application contain a "detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested."  Fed. R. Bankr. P. 2016(a). That is, the billing records that support a fee application should be organized by project categories, and the individual entries should indicate the time that was spent on each activity, in order to permit a court to determine whether the time spent was reasonable and proportionate to the tasks to be accomplished.

General Order 613 requires that "services should be noted in detail, with each service showing a separate time entry and not combined or 'lumped' together."  Gen. Order 613(A)(4)(vii).  And courts, within and outside this Circuit, have recognized this as well: "'[l]umping' of time entries where multiple tasks are described and associated within one block of time, without an allocation of time for each entry, is generally insufficient to satisfy the requirements of [Bankruptcy Code Section] 330."  *In re First State Bancorporation*, 2014 WL 1203141, at *3 (Bankr. D.N.M. Mar. 24, 2014).

This practice of amassing multiple time entries into a single entry is "'a practice universally disapproved by the bankruptcy courts for two reasons . . . [o]ne, it permits an

applicant to claim compensation for rather minor tasks'" and "'[t]wo, it prevents the Court from determining whether the individual tasks were expeditiously performed within a reasonable period of time.'"  *In re Recycling Indus., Inc.*, 243 B.R. 386, 406 (Bankr. D. Colo. 2000) (quoting *In re Leonard Jed Co.*, 103 B.R. 706, 713 (Bankr. D. Md. 1989), *amended by*, 118 B.R. 338 (Bankr. D. Md. 1990), *on reconsideration*, 118 B.R. 339 (Bankr. D. Md. 1990)).  By requiring the separation of individual time entries, courts "can scrutinize the reasonableness of the time expended," and accordingly, "counsel is not tempted to inflate the actual time spend and group multiple tasks together hoping to camouflage the true length of an individual task."  *In re Baker*, 347 B.R. 489, 495 (Bankr. E.D.N.Y. 2007).

A review of the Amended Time Records shows that DLO billed in seventy-eight individual entries, recorded on fifty-eight discrete days over a period encompassing nearly two and one-half years.  Of these, some nineteen entries can reasonably – and conservatively – be described as entries that do not provide the necessary detail about how much time was spent on each of several different tasks, or "lumped" entries.  As one example, Mr. Dahiya recorded a single entry of 10.10 hours of time on February 27, 2019 for work described as "Motion for judgment on pleadings: Finally completed the draft, took a break in between to speak to Wilson and Deslyn for 35 minutes, reverted back to draft and revised it and filed it and served all the parties to the case."  Am. Time Recs. at 4.  That is, in this one entry, it appears that Mr. Dahiya is billing for four separate tasks:  the preparation of a court document, a telephone conference with the clients, the filing of a document with the court, and service of that document on all parties to the case.

And on January 10, 2019, Mr. Dahiya recorded 1.9 hours for "continued additional affirmation in support of entry of default judgment:  "prepared the affirmation.  Filed it [with]

ECF.  Texted [opposing counsel] obtained the email address and fedexed the paperwork to

[opposing counsel]."  Am. Time Recs. at 3.  That is, in this single entry, Mr. Dahiya billed for

preparation of a court document, filing that document, and related administrative tasks.

The "lumping" of time charged to multiple tasks within a single time entry is not

consistent with the requirements of the Bankruptcy Rules and this Court's local rules, for good

reason.  This practice makes the task of reviewing the record of the case, the hours spent by the

attorney, and the work performed, in order to make a judgment as to the reasonableness of the

amount requested, far more difficult.  Without separate and individual task-based time entries,

the Court lacks the most basic tool that it needs to assess the reasonableness of the time spent on

each task.

"Courts faced with lumped time entries have either (1) denied the compensation

requested for such time entries, . . . or (2) made a global adjustment for all of the lumped time

entries reducing compensation for such entries by a certain percentage . . . solely on the basis of

lumping."  *In re Poseidon Pools of Am., Inc.*, 180 B.R. 718, 750 (Bankr. E.D.N.Y. 1995) (citing

cases).  For example, in a bankruptcy case in this District, the court concluded that it was

appropriate to disallow fifty percent of the fees requested in "lumped" time entries.  *In re Baker*,

2010 WL 153576, at *3 (Bankr. E.D.N.Y. Jan. 11, 2010).  In a different context where an expert

witness sought compensation for services rendered in litigation filed by the National Association

for the Advancement of Colored People, the court applied a thirty percent reduction to the

requested total amount of fees due to use of block billing.  *Gundlach v. Nat'l Ass'n for

Advancement of Colored People, Inc.*, 2005 WL 2012738, at *4 (M.D. Fla. Aug. 16, 2005).

Other courts in this circuit have reduced the time entries to thirty minutes of allowed time.  *See,

e.g., In re CCT Comm., Inc.*, 2010 WL 3386947, at *7 (allowing thirty minutes per lumped time

entry and disallowing the balance); *In re Brous*, 370 B.R. at 577 (limiting compensable time to thirty minutes for each of the lumped entries and disallowing the balance).

Other courts have reduced legal fees in proportions ranging from five percent to fifty percent. *See, e.g., In re Baker*, 2010 WL 153576, at *3 (deducting fifty percent of the fees reflected in block billing entries); *McDonald v. Pension Plan of NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 97 (2d Cir. 2006) (upholding the district court's five percent reduction for record-keeping that did not adequately indicate the nature of the services performed); *Williamsburg Fair Hous. Comm. v. New York City Hous. Auth.*, 2007 WL 486610, at *5 (S.D.N.Y. Feb. 14, 2007) (reducing fees by just over fifty percent where time records clustered various tasks together and contained other flaws).

Here, the record shows that DLO has submitted time records that include "lumped" or aggregate time entries recorded by Mr. Dahiya of more than thirty minutes that correspond to the provision of two or more distinct services. Specifically, the Court has determined that the following entries of more than thirty minutes combine multiple discrete legal tasks and services, and therefore will be subject to this adjustment and disallowance:

| | | | |
|---|---|---|---|
| 05/20/2018 | Reviewed the transactions the paperwork, deed power of attorney executed between the Wilson and Oumrow and notary of Oumrow family member, discussed with Ms. Johnson the reason for the transfers. | 1.90 | Am. Time Recs. at 1 |
| 02/24/2019 | Started preparation of judgment on pleadings. Reviewed the pleadings, filing the court and talked to the sister of the debtor, the background. | 1.70 | Am. Time Recs. at 3. |
| 04/15/2019 | Prepared for the motion for judgement on pleadings. reviewed the supplied discover attended the court hearing at 3 pm and came back to the office at 5: Was prepared but the judge adjourned it to June 4th… | 6.80 | Am. Time Recs. at 4. |
| 11/09/2018 | Prepared the amended motion for default judgment and attached the affidavit of additional service of the complaint etc. upon Oumrao team. | 1.20 | Am. Time Recs. at 2. |
| 11/26/2018 | Prepared second motion for default and service of the same and filed the same. | 2.60 | Am. Time Recs. at 3. |

| | | | |
|---|---|---|---|
| 01/10/2019 | Continued Additional Affirmation in support of entry of Default judgment: Prepared the affirmation. Filed it with ecf. texted Ms. Collsion obtained the email address. and fedexed the paperwork to ms. Collsion | 1.90 | Am. Time Recs. at 3. |
| 02/27/2019 | Motion for judgement on pleadings: Finally completed the draft, took a break in between to speak to Wilson and Deslyn for 35 minutes, reverted back to draft and revised it and filed it and served all the parties to the case. Intricate issues addressed. Judgment demanded on 6 counts. | 10.10 | Am. Time Recs. at 4. |
| 06/19/2019 | amending the motion for judgment on pleadings and filing it and sending it to Bronner | 2.00 | Am. Time Recs. at 4. |
| 12/17/2019 | Motion for summary judgment supplemental brief and undisputed facts prepared and filed with the court served electronically. | 6.50 | Am. Time Recs. at 5 |
| 02/28/2019 | Preparation of Initial disclosures under rule 26 and emailed it to the counselors and trustee and filed it with the court as a precautionary statements that other side counsel sees its importance. | 1.20 | Am. Time Recs. at 8. |
| 03/01/2019 | Discovery demands: reviewed the interrogatory laws and production of documents. Prepared three set of interrogatories and document discovery and emailed it to Bronner and also mailed it. | 5.70 | Am. Time Recs. at 8. |
| 04/11/2019 | Review of the discovery requests, non-compliance by Ourmow Singh...sending of email to Bronner and meeting with Desylyn Johnson...review of the law regarding lack of discovery response and consequences. and the start of preparation. | 3.50 | Am. Time Recs. at 8. |
| 10/24/2018 | Reviewed the filings and researched the law pertaining to default and preparation of the filing of the motion for default judgment | 1.30 | Am. Time Recs. at 2. |
| 01/09/2019 | Additional Affirmation in support of entry of Default judgment: review of the record, past filings and dates issued by the court. reviewed the motion to extend time as filed by Singh attorney ms. Collisson. Researched on the property 349 monroe street, brooklyn. Reviewed case law on Rule 55 (a) and (b). Researched case law on extension of time rule 9, FRBP 9006 And diligence of attorney. | 5.90 | Am. Time Recs. at 3. |
| 02/25/2019 | Rule 12(c) motion drafting begins. Standard of grant of motion. Affirmative defense ineffectuality, twombly standards to them? Research and writing of the motion. | 4.80 | Am. Time Recs. at 4 |
| 06/04/2019 | Researched on section 265-a equity theft laws of new York and prepared an additional affirmation in support of judgment on pleadings and for judicial notice and filed it with the court | 4.30 | Am. Time Recs. at 4. |

| 12/15/2019 | Preparation of the motion for summary judgment. Research on rule 56, the satisfaction of all standards, no disputed facts. Pleadings transparent, none disputed, any disputed issue no bearing on the motion at hand. Revised the case law on the elements of causes of action. | 3.30 | Am. Time Recs. at 4. |
| 05/21/2018 | Preparation of the complaint, research NYRPL 15, constructive trust, drafting of the complaint, pleading of the parties and their roles in the sham transaction to park the property—myth of moving property away from lender and completion of draft and filing. | 5.90 | Am. Time Recs. at 2. |

These aggregate or "lumped" entries of more than thirty minutes account for 70.6 hours of recorded time. Based on the entire record, the Court concludes that it is appropriate to reduce or disallow this time by twenty percent, or 14.12 hours, and to adjust the 70.6 hours of "lumped" entries to 56.48 hours.

Time entries related to Mr. Wilson's Chapter 13 bankruptcy case. Another issue presented by the record is the inclusion of time entries describing DLO's work in connection with Mr. Wilson's Chapter 13 bankruptcy case – work that DLO has substantially excluded from the scope of this Fee Application.

DLO states that its "Fee Application relates to the adversary proceeding and most of the time entries pertains to the same." Fee App. at 3. In addition, the Fee Application seeks compensation for DLO's work in connection with the Motion to Reimpose the Automatic Stay in the main bankruptcy case, but otherwise, time recorded in connection with DLO's representation of Mr. Wilson in the main bankruptcy case is not included. Specifically, the firm states that there is no "billing for the main chapter 13 case barring the motion to re-impose stay." Fee App. at 10.

Here, the record shows that the Amended Time Records submitted by DLO in support of the Fee Application include several entries that describe work performed by Mr. Dahiya and DLO in connection with Mr. Wilson's bankruptcy case that the firm has specifically excluded from this Fee Application. Specifically, the Court has determined that the following entries

correspond to time spent related to Mr. Wilson's underlying bankruptcy case, and do not relate to

the ASCB Action to recover title to the Property or the Motion to Reimpose the Automatic Stay,

and therefore will be subject to disallowance:

| | | | |
|---|---|---|---|
| 03/25/2019 | The court hearing, issues with the plan, domestic support affidavit missing, tax returns, trustee demanded missing… 341 fixed again for May 1st, 2019. | 4.30 | Am. Time Recs. at 2 |
| 09/20/2020 | Reviewed the bankruptcy trustee motion to dismiss, researched on the issue of law of the case as the judge had in the previous case ruled that no counseling was needed. Prepared the opposition and filed it with the court. | 1.70 | Am. Time Recs. at 8 |
| 09/21/2020 | Prepared and appeared telephonically, long wait, before judge, the judge granted continuation for the case, not to be dismissed, the plan to amended and served with an affidavit of service and DSO to be filed and Wilson to appear for the 341 meeting of creditors | 0.80 | Am. Time Recs. at 8-9 |

These entries account for 6.8 hours in recorded time.  They do not relate to work done in

connection with the ASCB Action or the Motion to Reimpose the Automatic Stay and therefore

must be disallowed.  Based on the entire record, the Court concludes that it is appropriate to

exclude this time from the Fee Application.

The reasonableness and proportionality of the time spent by DLO on the ASCB Action

and the Motion to Reimpose the Automatic Stay.  DLO seeks compensation for 166.8 hours of

attorney time, spanning a period of some twenty-eight months, from April 25, 2018, to

September 9, 2020, in the ASCB Action and the Motion to Reimpose the Automatic Stay.  As

described above, the Court has concluded that 70.6 hours in time recorded in "lumped" entries

should be reduced by twenty percent, to account for the "lumped" billing, resulting in an

adjustment from 70.6 hours to 56.48 hours.  The balance of 96.2 hours billed in connection with

the adversary proceeding and the Motion to Reimpose the Automatic Stay were recorded in single-task time entries.  In total, after adjusting the "lumped" billing hours, the Court must consider whether the adjusted total of 152.68 hours for services related to the ASCB Action and the Motion to Reimpose the Automatic Stay is reasonable and proportionate to the issues in that case.

In the ASCB Action,[3] DLO and Mr. Dahiya successfully established that the Defendants were unjustly enriched by the transfer of the Property and regained title of the Property for Mr. Wilson.  As the record of that adversary proceeding shows, the underlying facts were complicated.  The background to the ASCB Action includes nearly ten years of work by Ms. Johnson and Mr. Wilson to save the Property from foreclosure.  DLO took on the task of demonstrating that even though Ms. Johnson and Mr. Wilson entered into a consensual transaction with the Defendants and transferred title to the Property to them, that transaction was part of a scheme to defraud them of their ownership of the Property, in the guise of "rescuing" the Property from foreclosure.

Here, the record shows that to accomplish this result, significant efforts were required by DLO, over an extended period of time.  Mr. Dahiya appeared on behalf of Mr. Wilson at some twenty hearings and pre-trial conferences, participated in discovery, and filed and successfully argued the Amended Motion for Judgment on the Pleadings and two Motions for Default Judgment.  And the record also shows that DLO's representation of Mr. Wilson in the ASCB

---

[3]  The Motion to Reimpose the Automatic Stay was filed in Mr. Wilson's bankruptcy case, not the ASCB Action.  However, the Motion to Reimpose the Automatic Stay shielded the Property from foreclosure and was, in effect, a substantive prerequisite for Mr. Wilson's successful recovery of the Property in the ASCB Action.  Accordingly, the Court's discussion of DLO's services in the ASCB Action also applies to the firm's services provided in connection with the Motion to Reimpose the Automatic Stay.

Action extended over nearly two and one-half years, from May 2018 when the action was brought to October 2020 when it was closed.  At times, the Defendants participated in the ASCB Action and were represented by counsel, at other times they participated *pro se*, and from time to time, they indicated an interest in seeking a settlement.  And ultimately, they abandoned the defense of the matter entirely.  Finally, it is evident from the record that the recovery of the Property was the most important and central problem to be addressed in the ASCB Action, and indeed, in Mr. Wilson's bankruptcy case.

Viewed in the context of these circumstances, the Court is satisfied that DLO provided these services in a reasonable amount of time, commensurate with the "complexity, importance, and nature of the problem, issue, or task addressed." 11 U.S.C. § 330(a)(3)(D).  First, viewed in the aggregate, and taking account of the period of time that the adversary proceeding was underway, the time billed by DLO comes within a range of reasonableness for the amount and nature of work that would be required for DLO to provide adequate representation to Mr. Wilson throughout this extended litigation.  Second, the nature of the ASCB Action required DLO and Mr. Dahiya to oscillate between litigating against a *pro se* party, communicating with opposing counsel, engaging in settlement discussions, and finally securing a Judgment on the Pleadings. The complexity of the ASCB Action – and related Motion to Reimpose the Automatic Stay – support the finding that DLO provided services in a reasonable amount of time.  And finally, while this consideration is not dispositive, DLO obtained an excellent result and met the goals of his client by recovering the title to the Property.

For these reasons, and based on the entire record, the Court concludes that 152.68 hours in time spent by DLO on services to Mr. Wilson in connection with the ASCB Action and the Motion to Reimpose the Automatic Stay was reasonable and proportionate to the complexity of

the tasks that were undertaken.

*Whether the Rates Charged by DLO for its Professionals' Time Were Reasonable*

The next question that the Court considers is whether the rates charged by DLO were reasonable, including in light of what would be customary in both bankruptcy and non-bankruptcy matters.

DLO seeks compensation at an hourly rate of $550 for time recorded by Mr. Dahiya.  In support of this rate, DLO states that Mr. Dahiya is a "Harvard Law graduate, with intense academic record" and "has twenty years experience in complex litigation and bankruptcy law in several jurisdictions in the United States and abroad."  Fee App. at 9.  It points to the approval of comparable and even greater rates by this and other courts, and also notes that, by comparison, a "Connecticut admitted attorney [not a New York attorney] had fees paid at $500 an hour," citing this Court's decision in *In re Polanco*, 626 B.R at 31.  Reply at 9.  DLO argues that this rate has been previously awarded in prior cases in this District, and, in fact, is "less than those charged by [] peers with this level of experience, and even less than the assuaged blended rates of firms." Fee App. at 10.

Here, the record shows that DLO charges an hourly rate of $550 for Mr. Dahiya's time. The record also shows that, while the firm's Retainer Agreement lists hourly rates for $550 for Mr. Dahiya's time, $450 for counsel's time, associates at $150 to $200, and paraprofessionals at $75 to $125, Mr. Dahiya is the only individual that recorded time in this matter, and all of this time – regardless of the task – was charged at the highest rate, or $550.

To the same effect, while the time records show tasks that plainly are appropriate for a senior attorney such as Mr. Dahiya, and a senior attorney's hourly rate, they also show tasks that could be performed by a junior attorney or a paraprofessional – and in those circumstances, even

where the amount of time charged is reasonable and commensurate with the nature of the task, a

senior attorney's rate would not be a reasonable hourly rate to charge.

As one court has explained:

> The Court should be mindful that not all services should carry the same
> compensation . . . . The fact that an experienced attorney elects to perform routine
> ministerial services which could be performed by others far less experienced does
> not increase the value and should not increase the cost to the estate for these
> services.

*In re Kieffer*, 306 B.R. 197, 206 (Bankr. N.D. Ohio 2004) (quoting *In re Union Cartage Co.*, 56

B.R. 174, 178 (Bankr. N.D. Ohio 1986)).  As another court observed, "[c]ompensation for

routine work should be discounted."  *In re Ferkauf, Inc.*, 42 B.R. 852, 858 (Bankr. S.D.N.Y.

1984) (citing *Matter of Minton Group, Inc.*, 33 B.R. 38, 41, 10 B.C.D. 1233 (Bankr. S.D.N.Y.

1983); *Matter of Dee's Resort Wear, Inc.*, 25 B.R. 591, 591-92 (Bankr. M.D. Fla. 1982)).  And

as the Trustee notes in the Opposition, Mr. Dahiya "has billed at the $550 hourly rate for services

normally performed by junior associates or clerks, including research and service of papers."

Opp. ¶ 18.

A fee application is not an opportunity to favor one practice model or setting over

another.  A lawyer who practices as part of a larger firm may well have a far greater range of

colleagues – professional, paraprofessional, and administrative – with whom to share the tasks

associated with representing the firm's clients, and that firm should not somehow be favored in

the award of fees over a lawyer who practices in a smaller firm or, as Mr. Dahiya explains, in a

"solo and small firm" practice setting.  Reply at 5.  And indeed, according to the available data,

solo and small firm practitioners comprise the majority of the legal profession.  *See* CLARA N.

CARSON & JEEYOON PARK, AM. BAR FOUND., THE LAWYER STATISTICAL REPORT 5-6 (2005).

At the same time, just as a senior lawyer's hourly rate would not be reasonable for junior

lawyer or paraprofessional and administrative tasks in a larger firm setting, it is not a reasonable rate for those tasks in a solo and small firm practice. Rather, the determination of the reasonableness of an hourly rate calls for the court to assess the rates "customarily charged in the local community by someone who possesses similar skill, experience, expertise, stature and reputation who is faced with similarly novel and complex issues and who procures comparable results." *In re Korea Chosun Daily Times, Inc.*, 337 B.R. at 767 (quotations and citations omitted). Just as important, the court must consider whether the work performed corresponded to the skills (and hourly rate) of that professional. And where a senior lawyer seeks to be compensated as such for tasks that could well have been performed by a junior lawyer or a paraprofessional, then an appropriate adjustment may need to be made.

Here, and at the outset, the record shows that Mr. Dahiya's $550 hourly rate is a reasonable rate for an attorney of his "skill and standing in the pertinent legal community." *In re Ridgemour Meyer Props., LLC*, 2018 WL 2305765, at *13 (citing *Kerin*, 218 F.3d at 190). It is consistent with rates that this Court and other courts have approved, and it accords with the high level of experience and training that Mr. Dahiya has demonstrated in support of this application.

But that is not the end of the inquiry, because here, the record also shows that a portion of the work for which DLO seeks fees was not work that required the experience and training of a senior lawyer, or that supports an award of compensation at a senior lawyer's hourly rate.

For example, Mr. Dahiya recorded time at his $550 hourly rate for administrative tasks for which a paraprofessional rate would be more appropriate, such as "[p]rintout of the summons, prepared the package sent them via fedex upon Oumrow and parties," "affidavit of service of the summons prepared and filed with the court," and "summons service upon all defendant's certification filed." Am. Time Recs. at 2. These time entries total 1.6 hours, as

indicated below:

| 05/25/2018 | Printout of the summons, prepared the package sent them via fedex upon Oumrow and parties. | 0.60 | Am. Time Recs. at 2. |
|---|---|---|---|
| 05/30/2018 | Affidavit of service of the summons prepared and filed with the court. | 0.60 | Am. Time Recs. at 2. |
| 07/03/2018 | Summons service upon all defendant's certification filed. | 0.40 | Am. Time Recs. at 2. |

In addition, Mr. Dahiya recorded time at his $550 hourly rate for straightforward research tasks for which a junior attorney's rate would be more suitable, such as "researched and review different bankruptcy filing by Oumrow, 19 Raymond court, 1999 Nassau road, 349 Monroe House, pattern, pacer motion by or against him."  Am. Time Recs. at 1.  These time entries total 13.7 hours, as set forth below:

| 05/20/2018 | researched and review different bankruptcy filing by Oumrow, 19 Raymond court, 199 Nassau road, 349 Monroe House, pattern, pacer motions by or against him. | 1.20 | Am. Time Recs. at 1. |
|---|---|---|---|
| 05/20/2018 | Researched into possible claims, NYRPL 320 NYL 349, elements of fraud, conspiracy, unconscionability under the state law, unjust enrichment etc. Taking over the property without just cause or compensation. Sale for zero. | 2.30 | Am. Time Recs. at 1. |
| 10/30/2018 | Researched into the relief asked in the complaint. Judgment on merits-voiding of the deed transfer and attorney fees etc. | 2.40 | Am. Time Recs. at 2. |
| 02/24/2019 | Rule 12(c) research, judgment on pleadings. The scope of the Complaint causes of action. Amendment now, for 544 and 548 and new York state creditor debtor law 272, 274, 275. | 3.90 | Am. Time Recs. at 3. |
| 02/24/2019 | Research into Chapter 13 trustee to be brought in to start fraudulent conveyance actions, her fees, time pressure and impact on the existing cases. | 1.40 | Am. Time Recs. at 3. |
| 02/25/2019 | Pleading judgment motion, researched rule 201 judicial notice, governmental websites, admission party opponent. | 2.50 | Am. Time Recs. at 4. |

Courts agree that in such situations, a court may reduce the hourly rate charged by the senior attorney to a rate that is more appropriate for specific tasks that could have been performed by a junior attorney or paraprofessional.  As one court observed, if "there is no basis in the record to believe that such tasks were performed more efficiently or effectively than a paralegal would have performed them," then "there is no justification for the performance of

such tasks by persons charging attorney rates." *In re GSC Grp., Inc.*, 2012 WL 676409, at *7 (Bankr. S.D.N.Y. Feb. 29, 2012).

Here, the Court need look no further than the Retainer Agreement entered into between DLO, Mr. Wilson, and Ms. Johnson, to find appropriate rates. In that agreement, DLO identifies an hourly rate for work performed by paraprofessionals of $75 to $125, and an hourly rate for work performed by junior attorneys of $150 to $200. The Court finds that these are reasonable ranges for hourly rates for paraprofessionals and junior attorneys, and for the purposes of this Fee Application, finds that the average of the range, or $100 for paraprofessionals and $175 for junior attorneys, are reasonable rates for services of each time provided by DLO.

That is, here the record shows that a reasonable rate of compensation for those hours recorded by Mr. Dahiya for providing services that could have been provided by a paraprofessional is $100 per hour, and an appropriate adjustment will be made. And similarly, here the record shows that a reasonable rate of compensation for those hours recorded by Mr. Dahiya for providing services that could have been provided by a junior attorney is $175 per hour, and an appropriate adjustment will be made.

For these reasons, and based on the entire record, the Court concludes that the rates charged – and the rates proposed to be charged in the Retainer Agreement – by DLO for its professionals' time and services are reasonable, subject to the following adjustments. For work performed and hours recorded by Mr. Dahiya that is appropriately undertaken by a senior lawyer, the firm's senior lawyer hourly rate of $550 is reasonable. For work performed and hours recorded by Mr. Dahiya that could have been performed by a junior attorney, DLO's average proposed hourly rate of $175 is reasonable. When this hourly rate is applied to the 13.7 hours billed for junior associate tasks, the corresponding fees are reduced from $7,535 to $2,397.50.

And finally, for work performed and hours recorded by Mr. Dahiya that could have been performed by a paraprofessional, DLO's average proposed hourly rate of $100 is reasonable. Mr. Dahiya billed 1.6 hours for paraprofessional tasks, and this hourly adjusted rate results in a reduction from $880 in fees to $160 in fees.

### *Whether the Services Provided by DLO Were Necessary or Beneficial to Mr. Wilson at the Time They Were Performed*

The third question that the Court considers is whether the services provided by DLO were necessary or beneficial to Mr. Wilson at the time they were performed.

Even if a reasonable amount of time was invested in the task, and a reasonable rate was charged for the time, Bankruptcy Code Section 330(a)(3)(C) directs a court to undertake a kind of "reality check" to assure that when the professional provided the services, it made sense to do so. As the statutory language makes clear, the relevant time frame is "the time at which the service was rendered." 11 U.S.C. § 330(a)(3)(C). For these reasons, hindsight is not dispositive – that is, "[a] decision reasonable at first may turn out wrong in the end." *In re CCT Commc'ns, Inc.*, 2010 WL 3386947, at *5. But it is also fair to say that a good result may well confirm that the services were, in fact, necessary or beneficial to the debtor at the time they were performed.

The Trustee argues, in substance, that Mr. Wilson never intended to confirm a plan in this Chapter 13 case. DLO responds that significant value was recovered for the benefit of Mr. Wilson and his Chapter 13 estate, primarily through the ASCB Action, in which the transfer of the Property to the Defendants was undone and the Property was recovered. DLO states, in substance, that in these unusual circumstances, the goal of the bankruptcy case was to recover the Property, and Mr. Dahiya, on behalf of Mr. Wilson and Ms. Johnson, was successful in achieving this goal. While this is far from a typical goal or a conventional path, this Chapter 13 case and the associated ASCB adversary proceeding provided the opportunity for Mr. Wilson

and his family to achieve their objectives, even though a confirmed Chapter 13 plan was not part of the picture.

Here, the record shows that the services provided by DLO to Mr. Wilson in the ASCB Action were necessary and beneficial to Mr. Wilson, for several reasons. Within approximately a month after this bankruptcy case was filed, DLO commenced the ASCB Action with the objective of undoing the transfer of the Property to the Defendants and returning it to Mr. Wilson. And approximately sixteen months later, the Court entered the Judgment declaring Mr. Wilson to be the owner of the Property. *Wilson*, Adv. Pro. No. 18-01062, ECF No. 72. That is, through the DLO's efforts, and the work of Mr. Dahiya, Mr. Wilson's goal of regaining title of the Property was accomplished. The record indicates that the Property has significant value, including approximately $300,000 in equity. *See* Proof of Claim 1 (Wells Fargo Claim). *See also* ECF No. 7 (Sched. A/B). Plainly, this meets the threshold of "necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of" this case. 11 U.S.C. § 330(a)(3)(C).

Still, a cautionary note is warranted. The record of Mr. Wilson's Chapter 13 case is not a good one, and it was marked by procedural and substantive shortcomings from its inception to its dismissal. The Chapter 13 Trustee brought four motions to dismiss and scheduled at least sixteen Section 341 meetings of creditors, but none ever occurred. Administrative deficiencies were identified but left unaddressed. Basic documents were not provided, and a realistic Chapter 13 plan was never proposed. And it took several hearings and even an order to show cause for DLO to address the procedural and substantive shortcomings in the record of this Fee Application. This approach to the requirements of the Bankruptcy Code and Rules, and to compliance with Court directives as fundamental as notice and service, makes the work of the

Court and all of the parties with an interest in a matter far more burdensome than it needs to be.

For these reasons, and based on the entire record, the Court is satisfied that DLO has shown that the services that it provided to Mr. Wilson in the ASCB Action were necessary and beneficial to him at the time that they were performed.

\*              \*              \*

In sum, pursuant to Bankruptcy Code Section 330(a)(3), and the many cases that have interpreted and applied it, the Court has considered three factors in considering whether DLO's Fee Application should be granted – first, the reasonableness and proportionality of the time spent by DLO; second, the reasonableness of DLO's rates, including Mr. Dahiya's rate; and third, the necessity or benefit of the services provided by the firm.

The Court finds and concludes that, in substance, subject to the disallowance or reduction of certain time entries, the time spent by DLO was reasonable and proportionate to the complexity of the case. The Court disallows 14.12 hours for lumped time entries and disallows 6.8 hours for hours billed for tasks not related to the ASCB Action or Motion to Reimpose the Automatic Stay. This disallowance of 20.92 hours corresponds to a reduction of fees in the amount of $11,506.

The Court further finds that Mr. Dahiya's rate was reasonable for the senior attorney tasks that he performed, but that adjusted rates should be applied for tasks that could have been performed by a junior associate or paralegal. Application of these adjusted rates results in a reduction of fees in the amount of $5,857.50.

And finally, the Court finds that DLO's services were necessary and beneficial to Mr. Wilson.

## **Conclusion**

For the reasons stated herein, and based upon the entire record, the Court grants the Fee Application in part.  The Court finds and concludes that DLO has shown that it is entitled to a final allowance of compensation, in the amount of $48,116.50, representing the amount requested of $95,480, reduced by: (i) DLO's voluntary reductions totaling $10,500, (ii) past payments totaling $19,500, and (iii) the Court's disallowances totaling $17,363.50.  An order in accordance with this Memorandum Decision shall be entered simultaneously herewith.



**Dated: Brooklyn, New York**
**January 3, 2022**

_____
**Elizabeth S. Stong**
**United States Bankruptcy Judge**